# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 03-1515

ANCHOR GLASS CONTAINER CORPORATION,

*Plaintiff-Appellant*,

*v.*

ULRICH BUSCHMEIER and PETRA BUSCHMEIER,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 01 C 430—**William C. Lee**, *Judge*.

ARGUED FEBRUARY 7, 2005—DECIDED OCTOBER 18, 2005

Before ROVNER, WILLIAMS, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Anchor Glass Container Corporation ("Anchor") loaned its parent company, G&G Investments, Inc. ("G & G"), approximately $17 million needed by G & G to make an initial installment payment toward the purchase of a German glass company known as Kommanditgessellschaft in Firma Hermann Heye ("Heye"). When the deal went sour after the initial $17 million had been paid, G & G proceeded to arbitration on the question of whether Heye's principal shareholder, Petra Buschmeier, would be required to return the initial payment. The arbitration panel eventually ruled in favor of Mrs. Buschmeier. In the present case, Anchor has sued Petra Buschmeier and her husband, Ulrich, seeking the return of

the same $17 million that was at issue in the arbitration proceeding. The district court dismissed the action, holding that there was sufficient identity in the causes of action and the parties that the arbitration award was res judicata as to Anchor's claims. Anchor appeals and we affirm.

## I.  Background

In the spring of 1998, G & G, backed by a consortium of Canadian coinvestors,[1] entered into negotiations with Petra and Ulrich Buschmeier for the acquisition of Heye, a German limited partnership. One of the principal negotiators acting on behalf of G & G was Richard Deneau, president and CEO of Anchor, a subsidiary of G & G. Petra Buschmeier owned a 60.1% interest in Heye, and Ulrich Buschmeier owned another 1.02%. In the course of the negotiations, the Buschmeiers represented to G & G that any sale of Heye would require the Buschmeiers to first purchase the interests of minority shareholders as well as the usufructuary rights of Petra Buschmeier's mother. The Buschmeiers indicated they had agreements in place that would allow them to force the sale of those interests but that time was of the essence because of an impending deadline within which a sale of minority interests could be compelled.

On September 5, 1998, G & G executed an agreement to purchase Heye. The agreement required payment in three installments, the first of which—a payment of approximately $17 million—was due within three days. This sum was to be paid directly to Petra Buschmeier for use in purchasing her mother's usufructuary rights. The second payment was due a week later and the final payment a

---

[1]  G & G's coinvestors were two Canadian pension funds and an investment capital group.

month after that. The purchase agreement also con-
tained an arbitration clause which stipulated that "[a]ll
disputes arising in connection with this Agreement shall be
finally settled under the Rules of Arbitration of the Interna-
tional Chamber of Commerce by three arbitrators appointed
in accordance with said rules."

Apparently G & G's execution of the purchase agreement
and the tight payment schedule to which it had committed
caught its Canadian coinvestors completely off- guard. The
day before the first payment was due, certain coinvestors
reported that their boards would not authorize the release
of the money needed to fund the initial installment until
additional due diligence was performed. G & G asked the
Buschmeiers for an extension of the initial payment due
date in order to placate the demands of the coinvestors and
secure the financial records they required. The Buschmeiers
refused to extend the deadline.

In an effort to meet the deadline and save the deal, G & G
turned to its subsidiary, Anchor, for a $17 million bridge
loan. Anchor agreed to loan G & G the funds for the initial
installment, provided that Deneau receive assurances that
the initial payment would be returned if G & G and its
coinvestors were unable to complete the acquisition of Heye
under the terms of the September 5 agreement. To this end,
Ulrich Buschmeier and Deneau had telephone conversa-
tions on September 7 and 8 in which Mr. Buschmeier
allegedly promised that the initial payment would be repaid
in the event the transaction was not completed. Buschmeier
also apparently reiterated that the deadline for making the
initial payment could not be extended due to the impending
expiration of Heye's agreements with its minority share-
holders. Deneau and his German counsel then drafted a
letter for Ulrich Buschmeier's signature dated September 8,
1998, addressed from Buschmeier to G & G's CEO, in which
Buschmeier confirmed that "this first installment . . . will
be repaid to G & G Investments, Inc., if for any reason,

or without reason, the transfer of the Sold Interest [in Heye] . . . does not occur." Buschmeier signed the letter and returned it to Anchor's German counsel. Thus reassured, Anchor immediately borrowed $17,330,026.37 against its revolving line of credit and wired the funds directly into the personal bank account of Petra Buschmeier, thereby meeting G & G's September 8 deadline for making the first payment.

When the deadline for making the second payment arrived one week later, G & G's Canadian investors still had not completed their due diligence. The Buschmeiers once again declined to extend the payment deadline. Following a series of events irrelevant to the present suit, G & G's Canadian investors completely withdrew from participation in the proposed acquisition of Heye. G & G attempted to secure replacement financing and negotiations to save the deal ensued, but none of these efforts bore fruit. By February 1999 all parties considered the deal to be dead. When Petra Buschmeier made it clear she had no intention of refunding the $17 million due to G & G's breach of the payment schedule, a substantial volume of litigation ensued.

Pursuant to the arbitration clause in the purchase agreement, G & G requested arbitration before the International Chamber of Commerce ("ICC") on the question of whether the September 8 letter, drafted by Deneau and his attorney and signed by Ulrich Buschmeier, modified the terms of the purchase agreement such that Petra Buschmeier was required to return the initial payment. G & G's position was that the September 8 letter amended the original purchase agreement and amounted to an exit clause, entitling it to rescind the agreement and obtain the return of the money if the sale went uncompleted for any reason whatsoever—including, as ultimately occurred,

G & G's own inability to timely secure financing.[2] Petra Buschmeier took the position that the September 8 letter had no effect on the parties' obligations established in the purchase agreement, and that the letter was intended to require the return of the first installment *only* if the ultimate transfer of Heye became impossible because of *her own* failure to meet her obligations, most notably the possibility that she would be unable to purchase shares from the minority shareholders of Heye.

G & G and Petra Buschmeier were the only parties to the arbitration proceeding, and hearings before the panel of arbitrators were held in Germany in June 2001. One of the key witnesses—if not *the* key witness—on behalf of G & G was Deneau. Among other things, Deneau testified about his conversations with Ulrich Buschmeier on September 7 and 8 that culminated in the drafting and execution of the September 8 letter at the heart of the dispute.

After the hearings concluded but before the arbitrators rendered their decision, Anchor commenced the present action against the Buschmeiers, seeking return of the initial installment payment on theories of breach of contract, fraud, promissory estoppel, conversion, and unjust enrichment. Less than a month after this suit was filed, the ICC issued a final arbitration decision, denying G & G's claim for a refund and sustaining Petra Buschmeier's counterclaim for damages. The arbitrators, applying German law (required by the purchase agreement), held that the legal effect of the September 8 letter was determined by reference to Ulrich Buschmeier's good faith understanding of its meaning at the time he signed it. More specifically, the

---

[2] The purchase agreement contained no provision permitting cancellation, recission or refunding of installments previously paid on the grounds that funding for additional installments was not available or that additional due diligence was required by investors.

arbitration panel held:

> Therefore, the 8 September 1998 Letter can only be given the meaning, significance and relevance as were accepted by Mr. Ulrich Buschmeier, in the sense that Respondent [Petra Buschmeier] would be obliged to return the [initial payment] <u>in case the transaction would not materialise for reasons within Respondent's sphere</u>, i.e. if for any reason (or for no reason) Respondent would not succeed to obtain the Heye shares from the numerous Heye minority shareholders (emphasis in original).

In attempting to discern Buschmeier's understanding of what he agreed to in the September 8 letter, the arbitration panel attached great significance to Deneau's testimony concerning his preletter conversations with Buschmeier and Buschmeier's attorney. The panel concluded that in these conversations Deneau intentionally downplayed the significance of the letter, had not informed Buschmeier of his intention that the letter operate as an amendment to the purchase agreement, and had generally attempted to conceal his intent to engraft an exit clause onto the original purchase agreement. The panel also relied on the testimony of the German attorney retained by Anchor to assist in the drafting of the September 8 letter, finding that Deneau had intentionally neglected to inform the lawyer that the letter was intended as an amendment to the purchase agreement, adding an exit clause.[3]

Armed with the arbitration decision in its favor, the Buschmeiers moved to dismiss Anchor's lawsuit on the pleadings, arguing that there was sufficient identity of the parties and the causes of action such that the arbitra-

---

[3] We offer no opinion on the correctness of the arbitration panel's conclusions and cite them only for an understanding of the evidence upon which the decision rested.

tion award against G & G was res judicata as to Anchor's claims. The district court held that Pennsylvania law governed the res judicata analysis and the arbitration award was res judicata with respect to Anchor's claims and therefore dismissed the action. Anchor appeals.

## II. Discussion

### A. Choice of Law

Anchor argued in its briefs that the district court erred in holding that Pennsylvania law governed the res judicata analysis and contended that the law of the forum state, Indiana, applied.[4] At oral argument, however, Anchor explicitly withdrew its objection to the district court's choice of law; Anchor's counsel indicated that he had "studied the issue intently" following briefing and was now of the opinion that the choice-of-law issue was "academic" because the res judicata analysis is the same regardless of whether the law of Indiana or Pennsylvania is applied. We routinely permit parties to voluntarily abandon previously briefed issues at oral argument as a means of focusing the issues on appeal. *See, e.g., United States v. Bridges*, 760 F.2d 151, 152 n.2 (7th Cir. 1985); *Matter of Bero*, 110 F.3d 462, 464 n.1 (7th Cir. 1997); *Moore v. Bryant*, 295 F.3d 771, 776 n.1 (7th Cir. 2002). Accordingly, we accept the district court's conclusion that Pennsylvania law applies and proceed to the

---

[4] Federal jurisdiction in this case is founded upon diversity of citizenship, 28 U.S.C. § 1332. The Buschmeiers are residents of Germany; Anchor is a Delaware Corporation, having its principal place of business in Tampa, Florida. The amount in controversy greatly exceeds $75,000. Venue in the Northern District of Indiana was asserted pursuant to 28 U.S.C § 1391(a)(3) on the basis that the Buschmeiers were served with process in the district while visiting a relative there.

merits of the res judicata analysis.[5]

## B.  Res Judicata Effect of the ICC Arbitration

In Pennsylvania application of the doctrine of res judicata generally requires that the two actions possess the following common elements: (1) identity of the thing sued upon, (2) identity of the cause of action, (3) identity of the parties, and (4) identity of the capacity of the parties. *Dempsey v. Cessna Aircraft Co.*, 653 A.2d 679, 681 (Pa. Super. 1995), *appeal denied*, 663 A.2d 684 (1995). Anchor takes issue with the district court's conclusions concerning the second and third elements, arguing that the causes of action and the parties involved in the two actions are sufficiently distinct that the application of res judicata is unwarranted.

### 1.  Identity of the Causes of Action

Anchor argues that the arbitration was limited to a single issue of contract interpretation—whether the September 8 letter constituted an amendment to the purchase agreement—and that its claims in this case, by contrast, are predicated *not* on the September 8 letter but on "oral representations" made by Ulrich Buschmeier directly to Anchor (in the person of Deneau) during preletter telephone

---

[5]  Stated briefly, the district court's conclusion that Pennsylvania law applies was premised on the fact that the September 8 letter was an agreement between the Buschmeiers and G & G Investments calling for performance (return of the initial installment payment) to be made in G & G's home state of Pennsylvania. Similarly, with respect to Anchor's tort claims, the court held that any tort had been committed in Pennsylvania because this was the "site" of the Buschmeiers' failure to return the money to G & G. Due to Anchor's voluntary abandonment of the issue, we need not review the district court's choice-of-law analysis.

conversations on September 7 and 8, 1998. Thus (the argument goes), Anchor's claims in this suit are grounded on different claims for relief—fraud, promissory estoppel, conversion, and unjust enrichment—and a different evidentiary foundation, namely, oral representations made by Mr. Buschmeier.

Anchor's argument draws too fine a distinction between the claims res judicata insulates from relitigation and those that are excluded from the doctrine's scope. In Pennsylvania, as elsewhere, the causes of action litigated in the first action need not be *identical* to those in a subsequent action for res judicata to be successfully invoked. Rather, identity of the causes of action is evaluated by reference to the similarity of the acts complained of, the demand for recovery, and the identity of "witnesses, documents and facts alleged." *In re Jones & Laughlin Steel Corp.*, 477 A.2d 527, 531 (Pa. Super. 1984); *Dempsey*, 653 A.2d at 681. In making this determination, Pennsylvania courts "cannot and will not elevate form over substance" and have held that "the form in which two actions are commenced does not determine whether the causes of action are identical." *Chada v. Chada*, 756 A.2d 39, 43 (Pa. Super. 2000). Instead, "if the acts or transactions giving rise to causes of action are identical, there may be sufficient identity between two actions for the . . . judgment in the first action to be res judicata in the second." *Dempsey*, 653 A.2d at 681. Thus, rather than focusing on the specific legal theory invoked in a second suit, Pennsylvania courts are most interested in the "essential similarity of the underlying events giving rise to various legal claims." *Jones & Laughlin Steel*, 477 A.2d at 531.

Applying these principles here, we agree with the district court that there is sufficient identity of the causes of action in the arbitration and the present action for res judicata to apply. The ultimate relief sought in the two actions—return of the $17 million installment payment—is identical,

as is the alleged wrongful conduct of the Buschmeiers in refusing to refund the payment. The underlying events, the surrounding facts, the witnesses, and the documents giving rise to the claims in the respective actions are the same. Apart from the presence of differing legal theories of recovery, Anchor identifies only a single distinction between the arbitration and this case: Anchor disavows any intent to rely on the language of the September 8 letter but instead wants to litigate alleged oral misrepresentations made by Ulrich Buschmeier concerning the conditions under which the $17 million would be returned and the necessity of adhering to the deadline for payment of the first installment.

While the transcript of the arbitration proceeding has not been made a part of the record, it is clear from our reading of the arbitration panel's decision that Deneau was permitted to testify regarding his conversations with Buschmeier surrounding the drafting of the September 8 letter. Indeed, the decision quotes from Deneau's testimony concerning his discussions with Buschmeier during this time frame. The panel's decision makes it clear that this testimony was elicited in order to determine what Buschmeier intended by executing the September 8 letter. The arbitration award also indicates that Buschmeier testified at the hearing and was questioned concerning the content of his conversations with Deneau.[6] Accordingly, the acts and transactions Anchor seeks to litigate here are the same as those that were explored in the arbitration.

---

[6] Paragraph 109 of the arbitration decision states, "According to Mr. Buschmeier, during discussions which he had with Mr. Deneau, the latter downplayed the significance of the letter and maintained that it was only to be regarded as a formality of a declaratory nature. Mr. Buschmeier remembers Mr. Deneau saying, 'I need a paper here.'"

It is true that the arbitration decision does not specifically refer to what Deneau testified Buschmeier said to him, but the precise scope of Deneau's testimony is not dispositive. Application of res judicata is not prohibited merely because Deneau might have "held back" testimony at the arbitration concerning Buschmeier's alleged misrepresentations; nor would it be prohibited if Deneau was not asked all questions pertinent to the present claims during the course of the arbitration. Res judicata applies to claims that "could and should have been more fully developed" within the context of the first action, as well as "subsequent claims that *could have been* litigated in the prior action." *Chada*, 756 A.2d at 43 (emphasis added). Thus, because the conversations between Buschmeier and Deneau *were* at issue in the arbitration and *were* explored during the arbitration hearing testimony, Anchor's only proposed distinction between the two actions amounts to no distinction at all. The underlying events, witnesses, and evidence in the two actions are sufficiently similar so as to satisfy the res judicata element of identity of the causes of action.

### 2. Identity of the Parties

The third element of res judicata under Pennsylvania law is identity of the parties in the two actions. *Dempsey*, 653 A.2d at 681. Literal identity is once again not required; "the doctrine of res judicata applies to and is binding, not only on actual parties to the litigations, but also to those who are in privity with them." *Day v. Volkswagenwerk Aktiengesellschaft*, 464 A.2d 1313, 1317 (Pa. Super. 1983). In Pennsylvania, "there is no prevailing definition of 'privity' which can be applied automatically to all cases," *id.*, and "the privity enquiry should be flexible enough to acknowledge the realities of parties' relationships." *Myers v. Kim*, 55 Pa. D. & C.4th 93, 101 (Pa. Com. Pl. 2001).

In this context, the term privity is "merely a word used to say that the relationship between one who is a party on the record and another is close enough to include the other within the res judicata." *Myers*, 55 Pa. D. & C.4th at 100. Privity connotes "those so connected in law with a party to the judgment as to have such an identity of interest that the party to the judgment represented the same legal right." *Day*, 464 A.2d at 1317-18; *see also Ammon v. McClosky*, 655 A.2d 549, 554 (Pa. Super. 1995) (privity will exist when there is "such an identification of interest of one person with another as to represent the same legal right"); *Myers*, 55 Pa. D. & C.4th at 101 ("a nonparty may be bound if his interests are adequately represented by someone with the same interest who is a party") (quoting *Martin v. Wilkes*, 490 U.S. 755, 761 n.2 (1989)).

Anchor advances essentially the same argument regarding the identity of parties as it did on the identity of the causes of action—that its claims here are based upon oral misrepresentations made exclusively to its president, Deneau, while G & G proceeded only on a breach of contract in the arbitration and thus could not have pursued Anchor's additional claims in the arbitration. This argument is unpersuasive for several reasons. First, we have already concluded that there was sufficient identity of the causes of action possessed by Anchor and G & G to support a finding of res judicata. Second, Anchor's argument assumes that the existence of different legal theories of recovery available to G & G is tantamount to the two entities possessing disparate and distinct legal interests in the property at issue. We disagree with this premise. Despite the differing legal theories asserted by G & G and Anchor, the remedy and the interest in property pursued in both actions is identical—the return of the $17 million initial installment payment. There is but one legal interest in the return of property at stake in both actions, an interest shared by G & G and Anchor; the fact that the parent company sought to

vindicate its right via a contract action while the subsidiary couches its claims in the language of tort does not somehow divide that shared interest.

Moreover, the wall of separation between the legal entities known as G & G and Anchor was far from impenetrable.[7] The parties do not elaborate on the relationship other than to note that Anchor is a subsidiary of G & G, but we cannot ignore the fact that Deneau was one of the principal negotiators *for G & G* in the attempted purchase of Heye.[8] Furthermore, testimony at the arbitration hearing established that Deneau and another Anchor executive brought Heye to the attention of G & G as a potential target for acquisition. Deneau negotiated the September 8 letter and was a principal fact witness for G & G at the arbitration hearing. Under these circumstances, it would strain credulity to find that the interests of Anchor and G & G were so distinct that they are not aligned for purposes of res judicata. We agree with the district court that the identity of the parties is sufficient to warrant application of res judicata here.

The judgment of the district court is AFFIRMED.

---

[7] The arbitration decision describes G & G as a "simple shell company with very little in terms of assets and liquidity."

[8] The record only identifies Deneau as president and CEO of Anchor and is silent as to whether he also held a position as an officer or employee of G & G.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*