In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-3276

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JULIUS W. LAWSON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:13-CR-4 — **Theresa L. Springmann**, *Judge.*

ARGUED NOVEMBER 2, 2015 — DECIDED JANUARY 19, 2016

Before BAUER, POSNER, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Defendant-Appellant Julius W. Lawson and his confederate attempted to commit robbery in a United States branch post office located at a shopping center in Fort Wayne, Indiana. In the post office, the confederate pointed a firearm at a patron while Lawson looked for property to steal. Lawson was later apprehended because he left his cell phone, palm print, and fingerprints on the post office counter. His confederate was never identified.

A jury convicted Lawson on all three counts related to aiding and abetting firearm use during the attempted robbery of the post office.

Lawson appeals his convictions on three grounds. First, he argues that there was insufficient evidence for the jury to find that a "firearm" was used. Second, he contends that the jury was improperly instructed on the theory of aiding and abetting firearm use in light of *Rosemond v. United States*, 134 S. Ct. 1240 (2014), entitling him to a new trial. Third, he claims that he is entitled to a new trial because the government withheld evidence of an investigator offering a "bribe" to a witness and a police officer's disciplinary record in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). We disagree and affirm the judgment of the district court.

## I. BACKGROUND

Around 3:30 p.m. on December 19, 2012, two men entered through the first set of glass doors into the foyer of the Diplomat Post Office in Fort Wayne, Indiana. The men put masks over their faces and then walked through the second set of glass doors into the lobby of the post office. Postal worker Catherine Weigold spotted the men entering the lobby. She then ran into the back office, locked the door, and called the police.

The first man—the "counter-jumper"—walked across the lobby toward the unattended counter. The second man—the "gunman"—approached patron Dawn Hunter, pointed an object at her stomach, and said, "I have a gun." The counter-jumper walked over to Hunter and rummaged through her purse and wallet, but he took nothing. The gunman then directed Hunter to turn around and kneel in front of him.

Meanwhile, the counter-jumper returned to the sales counter, placed his hands on it, and jumped over the counter. After a brief search behind the counter, the counter-jumper took nothing and hopped back over the counter. The two men then left the post office, passing a second patron as they exited. Video surveillance captured the entire robbery attempt.

*A. Police Investigation and Indictment*

Both Hunter and Weigold contacted the police. Hunter reported that two men had robbed the post office, and one of the men had pointed a gun at her. When the police arrived, Hunter reported that there was a cell phone on the counter that was not there before the robbery attempt, and the video footage confirmed that it fell from the counter-jumper when he hopped back over the counter.

While police were investigating the scene, the cell phone began to ring. Postal Inspector Kathryn Maxwell viewed the phone's display, which showed a ten-digit number ending in 1880 and read "Violet." Fort Wayne Detective Mark Rogers, who was responsible for processing the crime scene, photographed the cell phone on the counter and took it into evidence. Cell phone records showed that the cell phone on the counter was registered to Julius Lawson.

The calls being received were from a phone registered to Violet Hanson, the mother of Lawson's son. At 9:37 p.m. that same day, Hanson consented to a search of her cell phone. There were seven outgoing calls made to Lawson's phone on the day of the attempted robbery.

Detective Rogers dusted the counter for prints and lifted seven latent prints and a palm print, which he placed into

evidence. Postal Inspector Andrew Gottfried sent the prints, along with two known prints of Lawson, to the National Forensics Lab in Dulles, Virginia. At trial, the fingerprint examiner testified that the latent prints and palm print found on the counter belonged to Lawson.

Following the robbery attempt, Inspector Gottfried interviewed Weigold. She described the counter-jumper as being about 5'8" with a thin build. She also said she saw the counter-jumper's face before he pulled down his mask and recalled him having no facial hair or tattoos. Lawson, however, had a thin mustache, light hair on his jaw line, and a small star tattoo on his left cheek. Gottfried showed Weigold a series of twelve photographs. Weigold said that if she "had to pick out of that stack, [she'd] pick him" as the counter-jumper. The photograph she chose was of Lawson.

On January 23, 2013, a Fort Wayne grand jury indicted Lawson on three counts related to aiding and abetting the use of a firearm during the post office attempted robbery in violation of 18 U.S.C. § 2114(a), 18 U.S.C. § 924(c), and 18 U.S.C. §§ 111(a)(1) and (b).

*B. Trial*

At trial, the government presented the physical evidence found at the scene, including the cell phone and its corresponding records, fingerprint evidence, and surveillance footage. In addition, Hunter testified that the gunman walked in and "said, 'I have a gun,' and he aimed it at [her] stomach." She said that she was able to see the "gun" when it was directly in front of her. When asked to identify that the object pointed at her was in fact a gun, the following exchange occurred:

Q: Are you familiar with guns at all, ma'am?

A: I grew up with a family that hunted, so yes, ma'am.

Q: How about handguns or pistols or—

A: Yes, ma'am.

Q: Do you have an idea what type of handgun that was?

A: It looked like my father-in-law's handgun.

Q: What type of gun does your father-in-law have?

A: He has a Cobra .380.

Q: Were you able to see what color the gun was?

A: Black.

Q: Do you know if it was a revolver or a semi-automatic or automatic or you couldn't tell?

A: It wasn't a revolver.

(Trial Tr. 16–17, May 15, 2013.)

On cross-examination, however, Hunter indicated that she was not positive that the object pointed at her was a Cobra .380, only that it "looked similar to a Cobra .380." The defense brought out a stage prop that was the same size, color, and shape as a Cobra .380. The stage prop was not a firearm because it did not have a firing pin, slide mechanism, clip, or ejection chamber. Hunter testified that she was "not positive" whether the object she saw that day was in fact a firearm and that it "could have been" a well-made replica.

After the government rested, Lawson moved for a judgment of acquittal on all counts. Fed. R. Crim. P. 29(a). In par-

ticular, Lawson argued that he could not be convicted under 18 U.S.C. § 924(c) because Hunter's testimony was insufficient to prove that the object was a "firearm"—meaning that it "will or is designed to … expel a projectile by the action of an explosive." § 921(a)(3)(A). Because she testified that it could have been either a firearm *or* a well-made replica, Lawson argued that the evidence was insufficient to find a "firearm." The district court took the motion under advisement, and the trial proceeded.

Lawson's primary defense at trial was alibi. The patron the robbers passed when exiting the post office was Curtis Molton, an acquaintance of Lawson's, who testified that he did not recognize either person leaving the post office to be Lawson. Cynita Wyatt and Elliot Diaz, friends of Lawson, both testified that Lawson was at their apartment between 3:30 and 3:45 p.m. on the day of the attempted robbery.

Hanson also testified for the defense. She testified that she and Lawson had gone to the post office the week before Christmas to buy stamps. She further testified that she had kicked Lawson out of her home on December 18, and that he did not return to her apartment until 5:00 or 5:30 p.m. the next day. She admitted that on the evening of the robbery attempt Lawson asked to use her phone to "try and track down his phone."

During her cross-examination on Thursday, May 16, 2013, Hanson admitted that Inspector Gottfried had interviewed her the night of the offense. After the defense rested, the government requested a recess to review a thirty-eight minute video recording of Gottfried's interview of Hanson for possible impeachment evidence. Lawson objected because the government had not disclosed the video recording

to the defense, and he requested to view a copy of the recording for potential exculpatory evidence. The district court granted Lawson's disclosure motion and dismissed the jury.

The following day, Lawson argued that the government had violated *Brady* because the recording contained impeachment material of Gottfried. Specifically, Lawson argued that Gottfried seemed to be offering Hanson a bribe for favorable testimony:

> Gottfried says, "Would there be any reason why [Lawson] is on the video robbing the post office?"

> Hanson said, "I hope he isn't. I don't know why he would be there. Then shit, where is my little money? He ain't done shit for my son."

> Gottfried replies, "Is that something you want? Is that something you need? Do you need money from us to help out?"

> Hanson replies, "No. Hell no."

(Trial Tr. 13, May 17, 2013.)

Lawson contended that this exchange shows that Gottfried offered Hanson a bribe, and he requested a mistrial as a result of the failure to disclose the video recording. Although the district court found that the failure to disclose was intentional, instead of declaring a mistrial, it granted Lawson more time to review the tape and permitted him to reopen any portion of his case. On Monday, May 20, the district court denied Lawson's motion for a mistrial, concluding that there was "no clear violation of *Brady*" because "almost four whole days ha[d] passed since the discovery [of] that statement[,] … [and] the defense now has an opportunity to

make a determination on how it wants to deal with that evidence."

Lawson chose to reopen his case and recall Inspector Gottfried to testify about his interview of Hanson. Gottfried admitted that he interviewed Hanson and that she had denied using her phone that evening to contact Lawson. Gottfried also admitted that he had offered Hanson money. He denied, however, that he was attempting to persuade Hanson to change her testimony in exchange for money. Instead, he testified that he was referring to the money available to persons who become confidential informants, but when Hanson said that she was not interested in money, he moved on. The defense chose not to recall any other witnesses and instead rested.

The district court denied Lawson's renewed Rule 29 motion for a judgment of acquittal, concluding that there was sufficient evidence "to possibly sustain a conviction."

After closing arguments, the district court instructed the jury. Specifically on count two, a violation of 18 U.S.C. § 924(c), the district court instructed:

> [T]he government [must] prove the following beyond a reasonable doubt:
>
> 1. The defendant knew, either before or during the crime, of another person's use, carrying, or brandishing of a firearm; and
>
> 2. The defendant intentionally facilitated the use, carrying, or brandishing of the firearm once so informed.

Lawson did not object to the instruction. Subsequently, the jury convicted Lawson on all counts.

*C. Post-Trial Procedure*

Four months after Lawson's trial, Detective Rogers was indicted in state court for sexual misconduct with a person subject to lawful detention, official misconduct, and false informing.

The government then requested Rogers's personnel file from the Fort Wayne Police Department, in which it found prior instances of misconduct that Rogers had not disclosed. The government disclosed to Lawson Rogers's four letters of reprimand: (1) in July 2013 (after Lawson's trial), Rogers was reprimanded for negligently failing to log evidence into the evidence management system; (2) in 2006, Rogers was reprimanded for a preventable accident involving a police vehicle; (3) in 2004, Rogers received a sustained reprimand for improper conduct; and (4) in 1998, Rogers received a sustained reprimand for improper conduct.

Lawson filed a motion for a new trial arguing that the failure to disclose Rogers's personnel file was a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). Lawson argued that Rogers's past misconduct impeached the reliability of the fingerprint evidence that he had collected. Lawson also argued that because of his disciplinary record, Rogers "knew he was on thin ice," and this knowledge "automatically makes Rogers biased and prejudiced against the defendant."

In addition, the Supreme Court issued its opinion in *Rosemond v. United States*, 134 S. Ct. 1240, 1249 (2014), in which it held that to sustain a conviction under 18 U.S.C. § 924(c), the jury must find that the accomplice had advance knowledge that a firearm would be used. Lawson moved for

a new trial based on *Rosemond* because the jury had not been properly instructed.

On August 26, 2014, the district court denied both of Lawson's motions. First, the district court concluded that Lawson had not been prejudiced by the government's failure to disclose Rogers's personnel file. Second, the district court acknowledged that the instruction given was an error under *Rosemond*, but it concluded that the erroneous instruction did not affect Lawson's substantial rights because based on the evidence presented at trial, the jury's verdict could "only be understood as a determination that the Defendant in- tended to assist in an *armed* robbery."

The district court sentenced Lawson to 84 months on counts one and three to be served concurrently and 60 months on count two to be served consecutively, plus three years of supervised release. Lawson appeals.

## II. ANALYSIS

Lawson raises three issues on appeal. First, he argues that there was insufficient evidence for the jury to find that there was a "firearm" used during the robbery attempt. Sec- ond, he challenges the district court's jury instruction in light of the Supreme Court's decision in *Rosemond*. Third, he con- tends that he is entitled to a new trial in light of evidence that was not disclosed in violation of *Brady*. We address each issue in turn.

### A. Sufficiency of the Evidence of "Firearm" Use

All three counts upon which Lawson was convicted re- quired the prosecution to prove beyond a reasonable doubt that Lawson aided and abetted the use of a "firearm." Law- son contends that the government did not meet this burden

because the only evidence that a firearm was used comes from Hunter, who testified that she was not sure whether the object was a firearm or a well-made replica.

When faced with a challenge to the sufficiency of the evidence, "we must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Smith*, 697 F.3d 625, 635 (7th Cir. 2012) (quotation marks omitted).

Determinations of a witness's credibility are to be made by the jury, and "[w]e will not … second-guess the jury's credibility determinations." *United States v. King*, 643 F.3d 1003, 1006 (7th Cir. 2011). "Generally, juries may reject parts of a witness's testimony while accepting other parts." *United States v. Colston*, 936 F.2d 312, 315 (7th Cir. 1991).

A "firearm" is defined as "any weapon … which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A). Use of a replica or toy gun is not sufficient to convict of an offense involving a "firearm." *Cf. United States v. Jones*, 222 F.3d 349, 351 (7th Cir. 2000) (implicitly acknowledging that a BB gun is not a "firearm").

Because the object used was never recovered and the surveillance footage could not be enhanced, the only evidence that there was a "firearm" comes from the testimony of Hunter. There is no requirement that the government produce the firearm or other corroborating evidence to sustain a conviction. *See United States v. Buggs*, 904 F.2d 1070, 1076 (7th Cir. 1990) (upholding conviction based on witness testimony without presence of the weapon). Nor is there any

requirement that the government produce an expert witness or more than one lay witness. *See, e.g.*, *United States v. Floyd*, 81 F.3d 1517, 1526 (10th Cir. 1996) (upholding firearms conviction based on testimony of one lay witness experienced with firearms); *United States v. Beverly*, 99 F.3d 570, 572 (3d Cir. 1996) (upholding conviction where victim testified that the defendant "threatened him with a gun during the course of the robbery, and that the gun … was a chrome-plated revolver"); *Parker v. United States*, 801 F.2d 1382, 1384–85 (D.C. Cir. 1986) (upholding conviction for using a "firearm" after concluding that testimony by an "expert" witness is not necessary).

Hunter had ample opportunity to view the gun up close while it was pointed directly at her stomach. Hunter testified that she was familiar with guns, that the gun looked like a Cobra .380, and that it was not a revolver. Additionally, the robber told her that he had a gun—implying that it was operable and that he would be willing to use it if Hunter did not comply. *Cf. Parker*, 801 F.2d at 1384 ("The act of threatening others with a gun is tantamount to saying that the gun is loaded and that the gun wielder will shoot unless his commands are obeyed." (quotation marks omitted)).

Hunter's testimony is sufficient for a rational juror to find beyond a reasonable doubt that the object used was in fact a firearm. The jury was free to discredit the portions of Hunter's testimony where she admitted that it "could have been" a well-made replica. In fact, we have rejected just such an argument. *Buggs*, 904 F.2d at 1074–75 (upholding firearms conviction where police officer and lay witness testified that they saw "what *appeared* to them to be a large pistol. It *ap-*

*peared* to each of them to be a .357 magnum but neither was sure." (quotation marks omitted)).

Therefore, while it is preferable for there to be physical evidence and more witnesses to testify regarding the existence of a "firearm," it is not necessary. The jury was free to credit Hunter's testimony that the object was in fact a firearm, discredit the defense's attempts to show that it was a well-made replica, and find beyond a reasonable doubt that Lawson's confederate used a firearm.

*B. Jury Instruction In Light of* Rosemond

When a defendant did not object to a jury instruction at trial, we review only for plain error. *United States v. McClellan*, 794 F.3d 743, 753–54 (7th Cir. 2015). "In order to reverse for plain error, we must find (1) error (2) that is plain, and (3) that affects the defendant's substantial rights." *Id.* at 754 (quotation marks omitted). To show that an error affected a defendant's substantial rights, he "'must demonstrate that [the error] affected the outcome of the district court proceedings.'" *United States v. Caira*, 737 F.3d 455, 462 (7th Cir. 2013) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)). Finally, we may exercise our discretion to correct the error if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* (alteration in original and quotation marks omitted).

For instructional errors, we evaluate whether the defective instruction "improperly influenced the jury's verdict," *United States v. Salinas*, 763 F.3d 869, 879 (7th Cir. 2014), "against the backdrop of the entire trial," *Caira*, 737 F.3d at 464. The verdict may stand "if it appear[s] 'beyond a reasonable doubt that the error complained of did not contribute to

the verdict obtained.'" *Caira*, 737 F.3d at 464 (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999)). Even under this test, "it is rare that we reverse a conviction on the basis of an improper jury instruction to which there was no objection." *United States v. Wheeler*, 540 F.3d 683, 689 (7th Cir. 2008).

The government properly concedes that the jury instruction given on count two, a violation of 18 U.S.C. § 924(c), was erroneous in light of *Rosemond v. United States*, 134 S. Ct. 1240 (2013). The only remaining question is whether this plain error affected Lawson's substantial rights. We conclude that it did not.

*Rosemond* held that in order to show aiding and abetting a § 924(c) offense, the "defendant's knowledge of a firearm must be advance knowledge—or otherwise said, knowledge that enables him to make the relevant legal (and indeed, moral) choice." *Id.* at 1249. That means knowledge of a firearm must come "at a time the accomplice can do something with it—most notably, opt to walk away." *Id.* at 1249–50.

The instruction given at Lawson's trial required that the government prove "that the defendant knew, either before or during the crime" of the firearm and "intentionally facilitated the use." The instruction was erroneous because it could hypothetically permit a conviction where the jury thought that Lawson learned of the firearm during the attempted robbery and intentionally facilitated its use *only* because it was too late for him to "opt to walk away." *Id.* Such a conviction would run afoul of *Rosemond*.

The theoretical possibility of a conviction on this improper ground, however, does not warrant reversal in this case. There is no reasonable doubt that had the proper instruction

been given, Lawson would have been acquitted. Given the evidence that was presented at trial, it is unreasonable to think that the jury convicted Lawson because he learned of the firearm during the crime and intentionally facilitated its use only because it was too late to opt to walk away.

After entering the post office, his confederate immediately pulled the firearm, announced that he had a gun, and pointed it at Hunter. Lawson did not abort the offense. Nor is there any indication in the video footage that Lawson hesitated at the sight of the gun, which appears to be in his line of sight while searching Hunter's purse. Instead, Lawson continued to participate in the offense. Lawson approached Hunter and looked through her purse and wallet. Lawson also hopped over the counter and searched for items to steal, all while his confederate continued to point the firearm at Hunter. Lawson then rejoined his partner and left with him.

Based on these facts, the government argued to the jury that Lawson and his confederate had a "division of labor already mapped out" before entering the post office: the accomplice would neutralize threats, while Lawson would steal property. Furthermore, these two men had the forethought to bring masks to hide their faces, indicating that there was a plan to rob the post office. They walked into the post office to rob it *in the middle of the day*. It is implausible that such a mid-day robbery plan would not have included a firearm designed to influence and threaten the employees or patrons that are sure to be there. *Cf. Parker*, 801 F.2d at 1385 ("[T]he use of an unloaded gun to rob a bank would be a very hazardous venture for the robber." (quotation marks omitted)). Accordingly, the verdict may stand because it ap-

pears beyond a reasonable doubt that the error complained of did not have any effect on the verdict.

Indeed, Lawson's case is quite distinct from the facts presented to the jury in *Rosemond*. *Rosemond* arose out of a "drug deal gone bad." 134 S. Ct. at 1243. In that case, a dealer arranged a drug deal with two men. The dealer drove to a park accompanied by two confederates, one of whom was Rosemond. One of the buyers entered the vehicle, inspected the marijuana, and instead of handing over the money, he punched the confederate in the face and ran. At that point, one of the male confederates—it was contested who this was—exited the vehicle and fired shots from a handgun. Rosemond was charged under § 924(c), and one of the theories of liability was aiding and abetting. The district court instructed the jury that a defendant is guilty of aiding and abetting a § 924(c) violation if he knew of the firearm at some point and actively participated *in the underlying drug crime. Id.* at 1244.

Lawson, however, was convicted of aiding and abetting by intentionally facilitating the use of a firearm, not just by participating in the underlying robbery attempt. Nothing in Lawson's case indicates that the use of a firearm was an unplanned surprise like in *Rosemond*'s drug deal gone wrong or that Lawson only intended to participate in an unarmed robbery. Rather, the wearing of masks and his confederate's pulling of the firearm before Lawson attempted to take property was evidence of an armed robbery gone right, and the jury's conviction based on the evidence it heard confirms this assessment. The crime that Rosemond intended to commit was a peaceful, albeit illegal, transaction, which is

quite distinct from the mid-day violent taking of property Lawson intended to commit.

Based on the evidence presented and the government's argument to the jury, the jury's conviction on count two can only be understood as finding that Lawson intended to aid and abet an *armed* robbery. Accordingly, Lawson has not shown that the erroneous instruction prejudiced him in any way, and a new trial is not warranted.

*C.* Brady *Claims*

Finally, Lawson contends that the government withheld evidence in violation of his due process rights. *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, he contends that the government's failure to disclose Inspector Gottfried's videotaped interview with Hanson and Detective Rogers's personnel file warrants a new trial.

We review a district court's decision to grant or deny a new trial for a *Brady* violation for an abuse of discretion; however, we review pure questions of law *de novo*. *United States v. Bhutani*, 175 F.3d 572, 576 (7th Cir. 1999).

To warrant a finding of a *Brady* violation, a defendant must point to specific evidence that was (1) favorable to the defense; (2) suppressed by the government; and (3) "material to an issue at trial." *United States v. Shields*, 789 F.3d 733, 746 (7th Cir. 2015) (quotation marks omitted).

Evidence is favorable to the defense when it is either exculpatory or could be used for purposes of impeachment. *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). The government concedes that the videotaped interview of Hanson and Detective Rogers's personnel record are favorable to the defense as impeachment evidence, and we agree.

The next prong of the *Brady* inquiry requires that the evidence was suppressed. "Evidence is suppressed when 'the prosecution fail[s] to disclose the evidence in time for the defendant to make use of it' and 'the evidence was not otherwise available to the defendant through the exercise of reasonable diligence.'" *Shields*, 789 F.3d at 746–47 (quoting *Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005)).

A mid-trial disclosure "suffices if time remains for the defendant to make effective use of the exculpatory material." *United States v. Higgins*, 75 F.3d 332, 335 (7th Cir. 1996); *see also Bielanski v. County of Kane*, 550 F.3d 632, 645 (7th Cir. 2008) ("Even late disclosure does not constitute a *Brady* violation unless the defendant is unable to make effective use of the evidence.").

The videotaped interview was disclosed on May 16, and the jury was dismissed. No more evidence was heard until May 21. During that time, Lawson and his counsel reviewed the tape. The district court gave Lawson wide discretion to reopen his case and recall any witnesses in order to incorporate the videotape. Inspector Gottfried did admit that he offered Hanson money. Finally, Lawson argued extensively to the jury that Inspector Gottfried had offered Hanson a bribe. Accordingly, Lawson was able to make effective use of the impeachment evidence contained in the video recording. *See United States v. Fallon*, 348 F.3d 248, 252–53 (7th Cir. 2003) (holding that evidence disclosed during trial was not "suppressed" where the defendant was able to cross-examine witness with the impeachment evidence and witness admitted to falsifying documents).

Lawson argues that he was unable "to incorporate this evidence into [his] presentation to the jury" because he

could not question the cell-records witness or Hanson. (Appellant's Br. at 29.) That is not the case. The district court gave Lawson broad authority to reopen his case in any way he saw fit. It was his choice to only recall Inspector Gottfried, and he did in fact get an admission. Because Lawson was able to effectively make use of the videotaped interview, it was not suppressed under *Brady*.

The government concedes, however, that Detective Rogers's personnel record was suppressed within the meaning of *Brady*, and we agree. The remaining inquiry then is whether it was material. It was not.

Evidence is material for purposes of *Brady* if there is a "'reasonable probability' of a different result," meaning that the "suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). In examining whether evidence was material, the court considers "what purpose the evidence would have served and how it might have affected the jury's view of the evidence that was introduced." *Toliver v. McCaughtry*, 539 F.3d 766, 780 (7th Cir. 2008) (citing *Kyles*, 514 U.S. at 441–54).

Lawson claims that evidence that Detective Rogers had been reprimanded for improper conduct twice and for his involvement in a preventable accident with a police vehicle undermines confidence in the verdict in two ways.

First, Lawson argues that the records tend to show that the fingerprint evidence is unreliable because it allows the jury to question "the manner in which he gathered evidence from the crime scene and his maintenance of the ongoing integrity of that evidence." (Appellant's Br. at 33.)

Second, Lawson argues that Rogers's disciplinary record tends to make it more probable that Detective Rogers replaced the fingerprints of the "real robber" with those of Lawson.

Rogers's only testimony was that he dusted for prints, lifted the latent prints that he found, and placed them on a white backing card. Rogers then turned the card over to Inspector Gottfried who placed it in a sealed bag and recorded it into evidence. Lawson was not implicated until an independent examination was conducted by a fingerprint examiner.

The fact that several years prior Detective Rogers had been reprimanded for improper conduct and involved in a preventable accident does not tend to make it more probable that Rogers mishandled the evidence or replaced the fingerprints he lifted with Lawson's. Nothing in the personnel file at the time of Lawson's trial suggests that Rogers had a history of mishandling evidence. Nor is there any explanation as to why Rogers would have replaced the "real robber's" fingerprints with Lawson's—a man he did not know.

Instead, Lawson's fingerprints ended up on a card that was marked with the date, time, and location of the fingerprint lift and independently examined and attributed to Lawson. Given the extensive evidence against Lawson, including the fact that his cell phone was found at the scene of the crime, there is no reasonable probability that prior disci-

plinary actions against Rogers would have affected the outcome.[*]

Finally, Lawson argues that the cumulative effect of the videotaped interview of Hanson and Rogers's personnel record shows a pattern of police misconduct that "raises significant questions about the integrity and completeness of the investigation." (Appellant's Br. at 32.) We disagree. The evidence against Lawson was extensive. In addition to the fingerprint evidence, the jury saw surveillance footage of the entire attempted robbery. The jury saw an object fall from the counter-jumper's pocket when he jumped over the counter and heard that Lawson's cell phone was found on the counter. Hanson testified that Lawson could not find his phone later that evening and used her phone to call his. The jury also heard testimony from eyewitnesses, including the post office worker who later identified Lawson as the counter-jumper. Furthermore, Lawson was able to argue to the jury that Inspector Gottfried offered Hanson a "bribe." Given the overwhelming evidence against Lawson and his ability to use the videotape of Hanson's interview at trial, the evidence that he points to as showing police misconduct does not put the case in such a different light as to undermine confidence in the verdict.

---

[*] The government's reliance on Officer Rogers's assertion before trial that there was nothing in his disciplinary file "pending or sustained that went to his truthfulness" is not best practice. *See* Dep't of Justice, U.S. Attorneys' Manual § 9-5.100 ("[P]rosecutors will receive the most comprehensive potential impeachment information by having *both* the candid conversation with the agency employee *and* by submitting a request for potential impeachment information to the investigative agency." (emphasis added)).

### III. Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.