In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 15-3681

JIMMY T. DAVIS,

*Petitioner-Appellant,*

*v.*

JAMES CROSS, JR.,

*Respondent-Appellee.*

———————————

Appeal from the United States District Court for the
Southern District of Illinois.
No. 15-cv-169-CJP — **Clifford J. Proud**, *Magistrate Judge.*

———————————

ARGUED JULY 6, 2017 — DECIDED JULY 24, 2017

———————————

Before POSNER, KANNE, and SYKES, *Circuit Judges.*

PER CURIAM. In 1997, a jury in the District of Kansas found Jimmy Davis guilty of robbing a bank, 18 U.S.C. § 2113(a), possessing a firearm as a felon, *id.* § 922(g)(1), and aiding and abetting his confederate's use of a firearm during the robbery, *id.* § 924(c). Years later, he filed a habeas corpus petition under 28 U.S.C. § 2241, contending that he is innocent of the § 924(c) offense because he lacked advance knowledge that his confederate would use a firearm, as re-

quired for aiding and abetting liability, *see Rosemond v. United States*, 134 S. Ct. 1240 (2014). The district court disagreed, concluding that the evidence presented at trial established that Davis was not entitled to relief under *Rosemond*. Because we conclude that a properly instructed jury could not reasonably have doubted his guilt, we affirm.

One day in 1996, Davis and Steven Haslip entered a Kansas bank together and robbed it. Davis walked up to one of the bank's two teller windows and asked the teller, Alicia Ashenfelter, to change a ten-dollar bill for two rolls of dimes. The teller at the adjacent window, Peggy Anderson, asked Haslip, who she later testified had been "kind of lingering back," if he needed help. Haslip then quickly stepped to Anderson's window, drew a handgun, and demanded "all of the money." Ashenfelter had turned to ask Anderson for rolls of change and saw that Haslip had trained a gun on Anderson. When she turned back she found Davis—unarmed—next to her. Davis told her to open the drawers at both teller stations and put the money in a bag he held. Haslip then instructed Anderson to help a customer at the bank's drive-thru window and told the third employee working that day, Christine Burt, to retrieve money from the vault. After Ashenfelter opened the drawers at the two teller stations for Davis, Haslip directed the employees to get into the vault while Davis, according to Ashenfelter, "just hung back a little bit." Haslip closed the vault door, and the employees pressed an alarm switch inside. Haslip and Davis fled in a stolen car but were captured later. Police recovered about $13,000 and two handguns from the car.

At trial Davis proposed a jury instruction regarding liability for aiding and abetting Haslip's use of a firearm under 18 U.S.C. § 924(c), specifying that "knowledge that a gun

would be carried or used would be required … to convict." The district court did not adopt this instruction and instead provided a general instruction about the elements of aiding and abetting for any of the crimes charged. The jury found Davis guilty of each count of the indictment, and he was sentenced to 322 months' imprisonment (60 months of which was a consecutive term for the § 924(c) offense). His conviction was affirmed on appeal, *see United States v. Davis*, No. 97-3322, 1999 WL 29160 (10th Cir. Jan. 26, 1999), and his subsequent motion under 28 U.S.C. § 2255 was unsuccessful, *see United States v. Davis*, 19 F. App'x 775 (10th Cir. 2001). The aiding and abetting instruction was not at issue in either the direct appeal or the collateral attack.

In 2014, the Supreme Court in *Rosemond* overruled a line of cases in the Tenth Circuit, *see, e.g., United States v. Wiseman*, 172 F.3d 1196, 1217 (10th Cir. 1999), that understood aiding and abetting a § 924(c) crime to require mere knowledge that a confederate in a crime of violence was using or carrying a firearm. *Rosemond*, 134 S. Ct. at 1244–45. Instead, the Court concluded, aiding and abetting in this context requires advance knowledge that a confederate would use or carry a gun. *Id.* at 1243.

Afterwards, Davis filed this petition under 28 U.S.C. § 2241, arguing that his conviction under § 924(c) must be set aside because he did not have advance knowledge that Haslip would use a firearm during the robbery, as required by *Rosemond*. According to Davis, Haslip exploited his "diminished capacity"[1] and "duped" him into participating

---

[1] Davis was found incompetent to stand trial in two earlier, unrelated cases (in 1993 and 1995)—his incapacity stemming from injuries suffered

(continued…)

without telling him that the robbery would be armed. Davis added that he could not raise this argument in his original collateral attack under § 2255 because that case pre-dated *Rosemond*, and he could not bring a second § 2255 motion because *Rosemond* is a case of statutory interpretation.

The district court denied the petition. Assuming that § 2255 was inadequate or ineffective to challenge Davis's detention, as required to bring a petition under § 2241, *see* § 2255(e), the court concluded that the evidence presented at trial was sufficient for a jury to find that Davis was guilty of aiding and abetting Haslip's use of a firearm, even in light of *Rosemond*. The court cited *Rosemond*'s observation that "if a defendant continues to participate in a crime after a gun was displayed or used by a confederate, the jury can permissibly infer from his failure to object or withdraw that he had such [advance] knowledge" that the gun would be used. 134 S. Ct. at 1250 n.9. To that end, the court reasoned that when Haslip pulled the gun Davis had not yet initiated the robbery and could have walked away if he had not intended the bank robbery to be armed.

On appeal, Davis defends his ability to seek relief under § 2241 because the government disputes that he can demonstrate that § 2255 is inadequate or ineffective. *See* 28 U.S.C. § 2255(e). We have laid out three requirements for showing that § 2255 is inadequate or ineffective: (1) the petitioner

---

(…continued)

in a 1993 car accident. *See Davis*, 1999 WL 29160, at *2. The trial court here found Davis was competent after ordering psychiatric examinations and hearing testimony by two psychologists. *Id*. On direct appeal the Tenth Circuit found no clear error in that finding. *Id.* at *5–6.

must rely on a case of statutory interpretation (because invoking such a case cannot secure authorization for a second § 2255 motion); (2) the new rule must be previously unavailable and apply retroactively; and (3) the error asserted must be grave enough to be deemed a miscarriage of justice, such as the conviction of an innocent defendant. *Montana v. Cross*, 829 F.3d 775, 783 (7th Cir. 2016); *In re Davenport*, 147 F.3d 605, 610–11 (7th Cir. 1998).

Of these requirements, neither Davis nor the government belabors the first two. We have confirmed that *Rosemond* is a case of statutory interpretation and is retroactive. *See Montana*, 829 F.3d at 783–84. Further, because Davis was convicted in the Tenth Circuit, whose line of cases interpreting aiding and abetting liability for a § 924(c) offense was overruled in *Rosemond*, it would have been futile to argue earlier that he did not have advance knowledge of the firearm; the law of that circuit "was squarely against him" when he filed his original § 2255 motion. *Webster v. Daniels*, 784 F.3d 1123, 1136 (7th Cir. 2015) (en banc). Davis and the government disagree about the third requirement, which is tied with the merits of his claim that erroneous instructions led the jury to convict him despite his innocence. To proceed Davis must show that "more likely than not any reasonable juror would have reasonable doubt" that he was guilty of aiding and abetting Haslip's use of the gun in the robbery. *House v. Bell*, 547 U.S. 518, 538 (2006); *see also Schlup v. Delo*, 513 U.S. 298, 327 (1995).

To that end, Davis first contends that he may not have learned about the gun until late in the robbery, after he had already begun assisting it. He suggests that the evidence at trial permitted a reasonable inference that his and Haslip's actions were uncoordinated and that he did not notice that

Haslip had pulled a gun on Anderson until he was already behind the teller window with Ashenfelter. After all, Davis says, Haslip was at the other teller window and did not announce his gun, and Davis did not say anything to Ashenfelter about a weapon when he came up behind her and made his demands.

We are not persuaded by this first argument because no one would think that Davis did not notice what Haslip was doing. They were not on opposite sides of a large bank; there were just two adjacent teller windows, and Davis and Haslip were standing close to each other from the moment they walked in until Haslip went behind Ashenfelter's teller station. And the pair's actions were coordinated: Davis distracted Ashenfelter with his sham request for change while Haslip pulled the gun on Anderson, and the tellers' resulting shock enabled the unarmed Davis to drop the bank-customer pretense, cross over to the tellers' workspace, and make his demands up close.

Davis next argues that, even if he learned about the gun when Haslip pulled it out, a jury still could doubt his guilt of aiding and abetting. Haslip took advantage of his "mental infirmity," Davis says, and got him to participate without informing him that it would be an *armed* robbery; by the time Davis saw the gun in Haslip's hand, he could not realistically walk away. "[W]hen an accomplice knows nothing of a gun until it appears at the scene … he may at that late point have no realistic opportunity to quit the crime. And when that is so, the defendant has not shown the requisite intent to assist a crime involving a gun." *Rosemond*, 134 S. Ct. at 1249. And Davis says that Haslip would have been a dangerous person to cross (being armed, physically larger, and a convicted murderer), so leaving the bank could have in-

creased the risk of gun violence—a consideration relevant to the feasibility of quitting the crime, *see id.* at 1251.

But whether leaving the bank was a realistic option for Davis matters only if he did not anticipate Haslip's possession of a gun beforehand. *See United States v. Adams*, 789 F.3d 713, 714–15 (7th Cir. 2015) ("If he did [anticipate the gun], then he was culpable; if he did not, then it mattered whether he had a chance to stop assisting the criminal venture (i.e., to walk away) after learning that someone else was packing."). The fact that the robbery involved an evident plan to take the bank over—i.e., no mere demand-note robbery—using coordinated action between the two partners dispels any reasonable doubt about Davis's foreknowledge of the gun. As discussed earlier, Davis and Haslip acted in concert to take the bank by force: Once Haslip produced the gun, Davis quickly took advantage of the tellers' shock to invade their workspace. It is unlikely that Davis's decision to rush behind the counter was simply an on-the-fly adjustment once he "discovered" that Haslip was armed; rather, the pair's actions suggested that they "had a division of labor already mapped out," *United States v. Lawson*, 810 F.3d 1032, 1041 (7th Cir. 2016) (internal quotation marks omitted). And a takeover robbery would be expected to involve arms. As we observed in *Lawson*, which involved the armed robbery of a post office and a partner drawing a gun upon entry, "[i]t is implausible that such a mid-day robbery plan would not have included a firearm designed to influence and threaten the employees or patrons that are sure to be there." *Id*.

Davis disputes the accuracy of *Lawson*'s observation about the plausibility of a mid-day robbery being unarmed and points to statistics that many bank robberies, despite occurring during the day, are unarmed and involve demand

notes passed to tellers, not necessarily displays of weaponry. *See* FED. BUREAU OF INVESTIGATION, BANK CRIME STATISTICS 2015 (2016), www.fbi.gov/file-repository/stats-services-publications-bank-crime-statistics-2015-bank-crime-statistics-2015/view.[2] But while Davis is correct that the time of day *by itself* says little about the likelihood of arms being involved, he overlooks the fact that the court in *Lawson* was addressing another takeover robbery. These are quite uncommon, which undermines the utility of Davis's general observations about bank robberies in the aggregate.[3] When considering the takeover subgenre, it remains intuitive that firearms are much more likely necessary than in other types of robberies because a takeover scheme involves seizing a location and controlling everyone there through force or fear.

Because a properly instructed jury would not have doubted that Davis knew beforehand that Haslip would use a firearm in the robbery, Davis has not demonstrated his innocence of aiding and abetting that conduct, and the district court correctly denied his § 2241 petition.

AFFIRMED.

---

[2] According to the FBI, out of 4,091 total robberies, burglaries, and larcenies involving federally insured financial institutions in 2015, a firearm was used in 877, and a weapon was threatened in 1,762. A demand note was used in 2,416.

[3] Only 186 of the 4,091 bank crimes in 2015 were takeovers. The FBI's report does not say what portion of takeovers involved weapons.