COURT OF APPEALS
DECISION
DATED AND FILED

July 9, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP576-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2021CF35

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

 V.

JOSHUA LEE PIETRANTONIO,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Florence County: MICHAEL H. BLOOM, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Following a jury trial, Joshua Lee Pietrantonio was convicted of armed robbery with threat of force, possession of a firearm by a

felon, false imprisonment, carrying a concealed weapon, and two counts of misdemeanor bail jumping. Pietrantonio now appeals, asserting that the evidence presented at trial was insufficient to support his convictions for possession of a firearm by a felon and carrying a concealed weapon. We reject Pietrantonio's arguments and affirm.

## BACKGROUND

¶2    The charges against Pietrantonio arose following the robbery of a liquor store. On appeal, Pietrantonio does not dispute that the evidence introduced at his jury trial was sufficient to prove that he was the person who committed the robbery and falsely imprisoned the liquor store's clerk. Nor does he dispute that the evidence was sufficient to support his convictions on the two bail jumping charges. Instead, Pietrantonio challenges the sufficiency of the evidence only as to the charges of being a felon in possession of a firearm and carrying a concealed weapon. As such, the evidence summarized below relates primarily to those charges.

¶3    At trial, the liquor store's clerk, Alice,[1] testified that at around 8:57 p.m. on July 22, 2021, a man entered the store who was dressed in all black with black makeup on his face, a black face mask, and a dark stocking on his head. Alice testified that the man was carrying a backpack and pointed a gun at her. When asked to describe the gun, Alice stated, "I don't know if it was a

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2021-22), we refer to the victim using a pseudonym. All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

9-millimeter but it kind of looked similar to one, and you could see the scratch marks kind of where the bullet ejects out."

¶4    Alice testified that, at the man's direction, she put money from the cash register and change from a separate drawer into the man's backpack. In the meantime, the man took other items from the store, including cigarettes, lottery tickets, and a jar filled with "pull-tabs." When the man turned back and looked at Alice, he was still holding the gun, and she could see "little scratches where a bullet comes from."

¶5    The man subsequently told Alice to walk to the back of the store. Although the man was behind her, Alice testified that she "kn[e]w he had a gun." After the man took Alice to the back of the store, he told her that he would not hurt her, hugged her, and then exited the store. Alice did not hear any vehicle or see any headlights after the man left the store.

¶6    On cross-examination, Alice clarified that the man's gun "looked similar to a 9-millimeter, but [she did not] know for sure if it was or not." She specified that the gun "was a hand pistol, not a revolver." When defense counsel asked Alice whether she remembered making a statement to law enforcement that she "didn't know if the gun was real or not," she responded, "No, never made that."

¶7    Shortly after the robbery, law enforcement received a tip that Pietrantonio was the individual who had robbed the liquor store. Evidence was introduced at trial that Pietrantonio's home was approximately one to two miles from the liquor store on a road called Skyline Drive. Dina Aho, who lived near the liquor store, testified that on the night of the robbery, she saw a person wearing

a dark hoodie and backpack pedaling a bicycle quickly past her residence in the direction of Skyline Drive.

¶8    Johnathon Plonty, who had known Pietrantonio for about sixteen years, testified that his home, the liquor store, and Pietrantonio's residence on Skyline Drive form an "L" shape. Plonty testified that at around 9:00 or 9:30 p.m. on the night of the robbery, he saw a person wearing all black with a black mask bicycling past his home in the direction of Skyline Drive. Plonty also testified that about one month before the robbery, Pietrantonio stated that he had recently "gotten a handgun for some tattoo work he had done on a girl."

¶9    Jason Mills testified that he was Pietrantonio's friend and was staying at Pietrantonio's home on the night of the robbery. According to Mills, Pietrantonio returned home at about 9:15 that night. Pietrantonio had black paint on his face, was wearing a hoodie and a face mask, had a backpack, and seemed to be out of breath. Mills knew that Pietrantonio owned and rode a bicycle, which Pietrantonio kept in the yard.

¶10    Mills testified that after Pietrantonio entered the house, he told Mills that he had robbed the liquor store and showed Mills cash, lottery tickets, and tobacco products in his backpack that he had taken from the store. According to Mills, Pietrantonio also took a "handgun" out of his backpack. Pietrantonio subsequently gave Mills $700 of the cash from the robbery.

¶11    On cross-examination, Mills admitted telling police several days after the robbery that Pietrantonio had used "an airsoft pistol" during the robbery. On redirect examination, Mills testified that the gun he saw that night "looked real," but he could not say whether it was a real gun or an "air pistol."

4

¶12    Finally, Michael Graves testified that he and Pietrantonio were cellmates at the local jail during January and February 2022. According to Graves, Pietrantonio stated that he had buried a gun near a waterfall at his home and that the police would have a hard time finding it. On cross-examination, Graves conceded that Pietrantonio did not "clearly" say that he had a gun "on [him]" during the robbery.

¶13    At the close of the State's case-in-chief, Pietrantonio moved for a directed verdict on all counts. The circuit court denied that motion, and the jury later returned guilty verdicts on all six charges. The court subsequently imposed concurrent sentences totaling fourteen years' initial confinement followed by six years' extended supervision.[2] Pietrantonio now appeals, challenging the sufficiency of the evidence only with respect to his convictions for possession of a firearm by a felon and carrying a concealed weapon.

## DISCUSSION

¶14    "The question of whether the evidence was sufficient to sustain a verdict of guilt in a criminal prosecution is a question of law, subject to our de novo review." *State v. Smith*, 2012 WI 91, ¶24, 342 Wis. 2d 710, 817 N.W.2d 410. However, the standard that we apply when reviewing the sufficiency of the evidence is "highly deferential" to the jury's verdict. *State v. Beamon*, 2013 WI 47, ¶21, 347 Wis. 2d 559, 830 N.W.2d 681. We may not reverse a conviction

___

[2] The circuit court imposed the longest sentence of fourteen years' initial confinement followed by six years' extended supervision on the armed robbery count. On the firearm possession by a felon charge, the court sentenced Pietrantonio to two years' initial confinement followed by two years' extended supervision. The court sentenced Pietrantonio to nine months' jail on the carrying a concealed weapon charge.

"unless the evidence, viewed most favorably to the state and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990).

¶15 A defendant challenging the sufficiency of the evidence therefore bears a "heavy burden" to show that "the evidence could not reasonably have supported a finding of guilt." *Beamon*, 347 Wis. 2d 559, ¶21. "[W]hen faced with a record of historical facts which supports more than one inference, [we] must accept and follow the inference drawn by the trier of fact unless the evidence on which that inference is based is incredible as a matter of law." *Poellinger*, 153 Wis. 2d at 506-07. Thus, if any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence introduced at trial to find the defendant guilty, we may not overturn the verdict, even if we believe that the trier of fact should not have found guilt based on the evidence before it. *Id.* at 507. Notably, this standard applies regardless of whether a verdict rests on direct or circumstantial evidence. *Id.*

## I. Possession of a firearm by a felon

¶16 To convict Pietrantonio of possession of a firearm by a felon, the State needed to prove two elements: (1) that Pietrantonio possessed a firearm; and (2) that Pietrantonio had been convicted of a felony before the date of the offense. *See* WIS JI—CRIMINAL 1343 (2024). On appeal, Pietrantonio challenges the sufficiency of the evidence only as to the first element—i.e., his possession of a

firearm. Specifically, he argues that the evidence at trial was insufficient to show that he possessed a "real gun," as opposed to a "toy air gun."[3]

¶17 We agree with the State that the trial evidence was sufficient to support a reasonable inference that Pietrantonio possessed a "real gun"—that is, a firearm. Alice specifically testified that Pietrantonio pointed a "gun" at her during the robbery. She described the gun as looking "similar" to a 9-millimeter, and she was close enough to the gun that she could see "the scratch marks kind of where the bullet ejects out." She specified that the gun was "a hand pistol, not a revolver." During her testimony, she never expressed any doubt as to whether the gun was real, and she expressly denied telling law enforcement that she did not know whether the gun was real. Furthermore, Pietrantonio never introduced any evidence suggesting that Alice actually made such a statement to law enforcement. Based on Alice's testimony alone, the jury could reasonably infer that Pietrantonio possessed a firearm during the robbery, as opposed to a toy air gun. *See United States v. Lawson*, 810 F.3d 1032, 1039-40 (7th Cir. 2016) (concluding the evidence was sufficient to show that the defendant possessed a firearm, even though the only evidence of firearm possession was a witness's testimony and the witness conceded that the gun "could have been" a well-made replica); *see also Parker v. United States*, 801 F.2d 1382, 1383-85 (D.C. Cir. 1986) (concluding the testimony of two witnesses was sufficient to establish the defendant's possession of a firearm and rejecting the defendant's argument that the witnesses needed to be

---

[3] As relevant to this appeal, a firearm is "a weapon which acts by the force of gunpowder." *See* WIS JI—CRIMINAL 1343 (2024). A defendant possesses a firearm when he or she "knowingly ha[s] actual physical control of a firearm." *Id.* (footnote omitted).

knowledgeable about firearms for the fact finder to rely on their testimony on that issue).

¶18 Pietrantonio attempts to undermine Alice's testimony by claiming that she "was very careful to state that she was not claiming that [the gun she saw] was an actual 9-millimeter firearm." He also implies that Alice testified she did not "know for sure" whether the gun was real. These arguments mischaracterize Alice's testimony. Alice's testimony at the cited portion of the trial transcript states that she was not sure whether the gun was a 9-millimeter, as opposed to some other type of handgun. Contrary to Pietrantonio's suggestion, Alice never expressed any doubt as to whether the gun was real; she simply could not say precisely what kind of gun it was.

¶19 In any event, Alice's testimony was not the only evidence supporting a reasonable inference that Pietrantonio possessed a firearm. Mills testified that after Pietrantonio returned home following the robbery, he took a handgun out of his backpack. Although Mills ultimately testified that he could not say for sure whether the gun was real, the jury could consider his testimony that the gun looked real in determining whether Pietrantonio possessed a firearm.

¶20 In arguing to the contrary, Pietrantonio emphasizes Mills' prior statement to police that the gun was an airsoft gun, and he also highlights Mills' admission that he accepted $700 from Pietrantonio following the robbery. These arguments, however, are merely attacks on Mills' credibility. It was the jury's responsibility to determine the witnesses' credibility and the weight to be given to their testimony. *See Poellinger*, 153 Wis. 2d at 504. Mills' testimony that the gun looked real was not incredible as a matter of law; accordingly, along with other

evidence admitted at trial, the jury could rely on his testimony to draw a reasonable inference that Pietrantonio possessed a firearm. *See id.* at 506-07.

¶21    The jury could also consider Plonty's testimony that approximately one month before the robbery, Pietrantonio stated that he had recently "gotten a handgun for some tattoo work he had done on a girl." That testimony supported a reasonable inference that Pietrantonio had access to a handgun at the time of the robbery. In addition, the jury could consider Graves' testimony that after the robbery, Pietrantonio said that he had buried a gun near a waterfall at his home and that the police would have a hard time finding it. Based on that testimony, the jury could reasonably infer that Pietrantonio had buried the gun that he used in the robbery.

¶22    Pietrantonio asserts it is "common knowledge" that if the police deemed Graves' report to be credible, they would have obtained a search warrant and found the gun that Pietrantonio allegedly hid near the waterfall. Pietrantonio also argues it is "common knowledge" that if he had received a handgun from a woman in exchange for tattoo work, the State would have made efforts to identify that woman and would have subpoenaed her to testify at trial. Pietrantonio therefore asserts that Plonty and Graves "offered nothing that would tend to make it more likely that Pietrantonio was in possession of a real gun."

¶23    These arguments merely amount to speculation about alternative inferences that the jury could have drawn from Graves' and Plonty's testimony. However, "in viewing evidence which could support contrary inferences, the trier of fact is free to choose among conflicting inferences of the evidence and may, within the bounds of reason, reject that inference which is consistent with the innocence of the accused." *Id.* at 506 (emphasis omitted). Here, the jury was not

9

required to draw Pietrantonio's proposed inferences from Graves' and Plonty's testimony, and it could instead view their testimony as supporting a reasonable inference that Pietrantonio possessed a firearm.

¶24    In all, the testimony introduced at trial supported a reasonable inference that Pietrantonio possessed a real gun, as opposed to a toy gun, during and after the robbery.  Consequently, the evidence was sufficient to support Pietrantonio's conviction for possession of a firearm by a felon.

## II.  Carrying a concealed weapon

¶25    As noted above, Pietrantonio also argues that the evidence was insufficient to support his conviction for carrying a concealed weapon.  To convict Pietrantonio of that offense, the State needed to prove that: (1) Pietrantonio carried a dangerous weapon; (2) Pietrantonio was aware of the presence of the weapon; and (3) the weapon was concealed.  *See* WIS JI—CRIMINAL 1335 (2018).[4]  For the purposes of this offense, a "dangerous weapon" includes a firearm, and the term "concealed" means "hidden from ordinary observation."  *Id.*

¶26    The parties agree that, under the circumstances of this case, the first two elements of carrying a concealed weapon are substantially similar to the possession element of the possession of a firearm by a felon count.  We agree with the State that the evidence discussed above in relation to the possession of a firearm by a felon count was also sufficient to prove that Pietrantonio carried a

---

[4] A different jury instruction applies when there is evidence that the defendant had a license to carry a concealed weapon.  *See* WIS JI—CRIMINAL 1335B (2012).  Pietrantonio does not argue that he had such a license, and no evidence to that effect was introduced at trial.

dangerous weapon—that is, a firearm—on the night of the robbery and was aware of the presence of that firearm.

¶27 As to the remaining element, the jury could reasonably infer that Pietrantonio concealed the firearm in his backpack while riding his bicycle from the liquor store to his home following the robbery. Both Aho and Plonty testified that they saw an individual biking in the area between the liquor store and Pietrantonio's residence on the night of the robbery. Their descriptions of that person generally matched Alice's description of the robber. Alice testified that the robber was carrying a backpack and was dressed in all black with black makeup on his face, a black face mask, and a dark stocking on his head. Aho testified that the person riding the bicycle had a backpack and was wearing a dark hoodie, and Plonty testified the person was wearing all black and had a black mask. In addition, Alice testified that she did not see or hear a vehicle leaving the liquor store after the robbery, which further supports a reasonable inference that the person seen riding a bicycle in the vicinity was the robber. Moreover, neither Aho nor Plonty testified that the person riding the bicycle had a visible firearm, which supports a reasonable inference that the firearm used during the robbery was concealed in the person's backpack.

¶28 Furthermore, Mills testified that Pietrantonio owned and rode a bicycle and was out of breath when he returned home on the night of the robbery. Mills also testified that when Pietrantonio entered the house, he had black paint on his face, was wearing a hoodie and a face mask, and had a backpack. Mills further testified that Pietrantonio admitted robbing the liquor store; that Pietrantonio had cash, lottery tickets and tobacco products from the robbery in his backpack; and that Pietrantonio took what looked like a handgun out of his backpack.

¶29    Based on all of this evidence—and other evidence discussed above regarding the firearm possession by a felon count—the jury could reasonably infer that: (1) Pietrantonio robbed the liquor store; (2) Pietrantonio used a gun during the robbery; (3) after the robbery, Pietrantonio rode his bicycle home; and (4) Pietrantonio concealed the gun in his backpack while riding his bicycle. Thus, the evidence was sufficient to support the jury's determination that Pietrantonio carried a concealed weapon on the night in question.

¶30    Pietrantonio emphasizes that neither Aho nor Plonty could positively identify him as the person they saw riding a bicycle that night. He also notes that a video recording "obtained by law enforcement from one of the neighbors was insufficient to provide a positive identification." Based on these facts, Pietrantonio apparently believes the jury should have inferred that he was not the person riding the bicycle. As explained above, however, the evidence introduced at trial supported a reasonable inference that Pietrantonio *was* the person riding the bicycle. Again, when the evidence supports more than one reasonable inference, we must accept the inference drawn by the trier of fact. *See Poellinger*, 153 Wis. 2d at 506-07. Pietrantonio's challenge to the sufficiency of the evidence supporting his conviction for carrying a concealed weapon therefore fails.

        *By the Court.*—Judgment affirmed.

        This opinion will not be published. *See* Wis. Stat. Rule 809.23(1)(b)5.

12