**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Richard M. MAHKIMETAS, Defendant–Appellant.**

**No. 92–2633.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 20, 1993.

Decided April 13, 1993.

[redacted]

SHADUR, Senior District Judge.

Richard Mahkimetas ("Mahkimetas") was convicted in a jury trial of the distribution of cocaine in violation of 21 U.S.C. § 841(a)(1).[1] Mahkimetas appeals his conviction. We affirm.

*Background*

On April 25, 1991 William Parduhn ("Parduhn"), an undercover officer working with the Shawano County, Wisconsin Sheriff's Department, met Mahkimetas' mother Patty Mahkimetas ("Patty"). Parduhn took down Patty's name and telephone number and called her the next day to set up the cocaine deal that they had discussed when they first talked on April 25. They then met at a residence, and Patty placed a call to Mahkimetas to tell him about Parduhn's wanting some cocaine.

Next Parduhn and Patty drove to meet Mahkimetas at a house at the Midway area of the Menominee Indian reservation. Parduhn gave Mahkimetas $60, and Mahkimetas and a woman named Alice left in a car. They were followed to the Woodland Wheel Boutique (the "Boutique") by surveillance officers. Mahkimetas went into the Boutique and came out shortly, and the pair drove back to the house where Parduhn was waiting.

Mahkimetas gave Parduhn two magazine-paper-wrapped packets containing what appeared to Parduhn, and what laboratory analysis later revealed, to be cocaine. Parduhn gave each of Mahkimetas and Patty $10 "for [their] troubles." Parduhn then drove Patty back to where he had met her that day, stopping on the way at a liquor store so that she could buy beer.

Parduhn met Mahkimetas several more times, occasionally fronting Mahkimetas with money to take to his suppliers to see if he could purchase drugs. However, Mahkimetas never provided any more drugs to Parduhn.

On February 11, 1992 the grand jury sitting in the Eastern District of Wisconsin

Francis D. Schmitz, Asst. U.S. Atty., Milwaukee, WI (argued), for plaintiff-appellee.

Catherine M. Canright, Foley, Canright & Foley, Milwaukee, WI (argued), for defendant-appellant.

Before CUMMINGS and ROVNER, Circuit Judges, and SHADUR, Senior District Judge.[*]

[*] The Honorable Milton I. Shadur, of the Northern District of Illinois, is sitting by designation.

1. This provision will hereafter be cited simply as "Section—," without further reference to Title 21.

returned a one-count indictment charging Mahkimetas with the distribution of cocaine in violation of Section 841(a)(1). Mahkimetas went to trial on the charge, was convicted and was then sentenced to 18 months' imprisonment to be followed by 3 years of supervised release.

Mahkimetas filed a timely notice of appeal, over which we have jurisdiction pursuant to 28 U.S.C. § 1291. Mahkimetas raises two issues on this appeal:

1. Whether the district court improperly admitted testimony from Officer Parduhn recounting hearsay statements by Patty.

2. Whether the district court erred in refusing to give the jury an entrapment instruction.

We address those issues in turn.

### Admission of Parduhn's Testimony

Mahkimetas contends that the district court erred when it allowed into evidence, as nonhearsay because spoken by a coconspirator, statements made by Patty to Parduhn as to the purchase of cocaine. Here was Parduhn's testimony (R. 48–50):

A: [Patty] wrote her name, Frank, Rick down on a matchbook cover and the telephone number to the apartment, and told me to give her a call on the following day, the 26th of April, and she would have a deal set up with me to—

[Mahkimetas' Attorney]: Objection, hearsay.

The Court: That objection is overruled.

A: —to purchase some cocaine.

\* \* \* \* \* \*

Q: Did you make any additional phone calls [on April 26]?

A: Yes. I called her number in Keshena and talked to the defendant's mother, and she told me she had the deal set up and gave me directions to the house where she was at and told me to come up there.

\* \* \* \* \* \*

Q: And what happened after you got there?

A: Patty met me outside the door and told me to come in the house. At that time she introduced me to a few other people in the house; and then she picked up the telephone in the kitchen, dialed the number, talked to the party on the phone, then she handed me the phone and told me, here's your connection, talk to him.

[Mahkimetas' Attorney]: I just want to state a continuing objection to all this hearsay of Patty's under the hearsay rule and confrontation clause.

[Assistant United States Attorney]: The government submits it's properly admitted as coconspirator exception to the hearsay rule.

THE COURT: The objection is overruled.

■ Parduhn's recitals of Patty's out-of-court statements are of course inadmissible unless they are co-conspirator statements that qualify as nonhearsay under Fed. R.Evid. ("Rule") 801(d)(2)(E). To satisfy that Rule, under which statements by a coconspirator may be introduced against another conspirator, the government must show that (1) a conspiracy existed, (2) both the defendant and the declarant were members of that conspiracy and (3) the offered statement was made during the course of and in furtherance of the conspiracy (*Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987)). *United States v. Robinson*, 956 F.2d 1388, 1394 (7th Cir.1992) is exemplary of the numerous cases teaching that a district court's findings as to those elements are reviewed for clear error.

■ To establish the existence of a conspiracy, the offering party must show that there was an agreement to commit some illegal act and that the alleged conspirator knew "something of its general scope and objective though not necessarily its details" (*United States v. Cerro*, 775 F.2d 908, 911 (7th Cir.1985)). Mahkimetas contends that there was no unlawful agreement, and hence no conspiracy, at the time of Patty's statements to Parduhn. In response the government urges that "an agreement occurred on April 25th when the defendant's mother agreed to assist the undercover of-

ficer to obtain cocaine. Once the defendant engaged in discussion with the undercover officer, he too became a member of the conspiracy." Neither side has it entirely right.

■ It is universally held that the fact that one party to a conversation is a government agent or informer does not of itself preclude the admission of statements by the other party—if he or she is a member of a conspiracy—under Rule 801(d)(2)(E) (*Robinson*, 956 F.2d at 1394; *United States v. Mealy*, 851 F.2d 890, 901 (7th Cir.1988)). But our court has never had occasion to address the different question whether a conspiracy may be formed between a single criminally-motivated person and a government agent or informer. Nine other circuits have done so, and without exception they have answered that question in the negative (see *United States v. Barboa*, 777 F.2d 1420, 1422 n. 1 (10th Cir.1985) (compiling cases); *United States v. Iennaco*, 893 F.2d 394, 397 (D.C.Cir. 1990)).

As *Barboa*, 777 F.2d at 1422 put the matter succinctly:

> A conspiracy is an agreement between two or more people to commit an unlawful act, and there is no real agreement when one "conspires" to break the law only with government agents or informants. The elements of the crime are not satisfied unless one conspires with at least one true co-conspirator.

Where only one person is involved with a government agent or informant, at least one of the risks of conspiracy, that of concerted action shrouded in secrecy, is not present (*United States v. Escobar de Bright*, 742 F.2d 1196, 1199–1200 (9th Cir. 1984)). However, that situation does create a different and significant risk: that of "the 'manufacturing' of crime which might occur if the mere presence of government agents could create indictable conspiracies" (*Barboa*, 777 F.2d at 1422, citing *Escobar de Bright*, 742 F.2d at 1200). We join the unanimous lineup of our sister circuits in holding that Rule 801(d)(2)(E) is not brought into play by the sound of just one lawbreaker's hand clapping.

■ No conspiracy in the legal sense was therefore formed on April 25, 1991 between Patty and Parduhn. Hence Patty's statement to Parduhn before he spoke with Mahkimetas (the statement to which defense counsel first objected in the earlier-quoted excerpt from the trial transcript) was not admissible as Rule 801(d)(2)(E) nonhearsay, unless of course a conspiracy to make a cocaine distribution to Parduhn had already existed between Patty and Mahkimetas. No evidence has been presented to that effect, and it is clearly negated by the prospective nature of the statement that Parduhn ascribed to Patty (that on April 26 "she would have a deal set up").

■ On the other hand, the United States also misses the mark when it says in its brief that Mahkimetas joined the conspiracy when he spoke with Parduhn. *Bourjaily*, 483 U.S. at 178–80, 107 S.Ct. at 2780–81 establishes that the challenged statements may themselves be taken into account in factoring the Rule 801(d)(2)(E) analysis. In this instance the second quoted excerpt—in which Patty told Parduhn on April 26 that "she had the deal set up"—confirms that she had already spoken with Mahkimetas to arrange for a cocaine delivery as a result of her April 25 conversation with Parduhn. And that is corroborated by her "here's your connection" introduction before she turned the telephone over to Parduhn to talk with Mahkimetas in the third quoted excerpt. Finally, the ultimate corroboration is provided by the fact that at that point Mahkimetas was well aware of why he was talking with Parduhn. Here is Parduhn's testimony immediately after the last quoted excerpt (R. 50–51):

> Q. And what happened after this woman handed you the phone and said, here's your connection?
>
> A. I picked up the phone and there was a male voice on the other end. I asked who it was and the party said, this is Rick. He asked me my name. I said, it's Bill. And at that time he asked me what I would be looking for, and I told

him to start out with I would like to purchase a couple of Q's.

Q. What do you mean by Q's?

A. Quarter grams of cocaine which—

Q. Is that, you know—How much cocaine is a quarter gram of cocaine?

A. It would be approximately two and a half lines of cocaine. It's commonly sold in magazine bindles.

Q. And what happened after you told him you wanted a couple of Q's to start?

A. He told me that would be no problem to get it and told me to meet him at Midway, which is where he was at, the house he was at.

Thus the second and third segments of Parduhn's first-quoted testimony, coupled with the just-quoted Parduhn–Mahkimetas conversation and the actual distribution of cocaine that came hard on the heels of that conversation, establishes by the necessary preponderance of the evidence that Mahkimetas and Patty had indeed agreed to engage in the illegal activity after Parduhn's April 25 conversation with Patty and before those two spoke again on April 26. That agreement marked the onset of the conspiracy between two malefactors. And that being so, only the admission of the first Parduhn–Patty conversation (the one to which defense counsel interposed the initial objection) was error—and clear error.

 But clear error does not equate to reversible error. Although the parties' briefs did not expressly speak to the issue in these terms, the erroneous admission of Patty's single statement to Parduhn was unquestionably harmless. Fed.R.Crim.P. 52(a) provides the standard for such non-constitutional errors: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded" (see *United States v. Johnson*, 927 F.2d 999, 1003 (7th Cir.1991)). In the seminal language from *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946) the question is "whether the error itself had substantial influence" or "if one is left in grave doubt"—if so "the conviction cannot stand."

That cannot be said here. Even if Patty's April 25 statement to Parduhn about what she intended to do were to be excised from the case, the remaining evidence (including the other statements that Parduhn ascribed to Patty) overwhelmingly demonstrated Mahkimetas' guilt on the distribution charge. Indeed, on that score Mahkimetas himself provided damning evidence: Although he told a different story from the government's about where he obtained the cocaine,[2] he admitted that he delivered the cocaine to Parduhn. We are more than satisfied that the admission of Patty's single tainted statement to Parduhn could have had no "substantial influence" on the jury's verdict against Mahkimetas.

### Refusal To Give Entrapment Instruction

During the jury instruction conference, Mahkimetas' counsel requested that an entrapment instruction be given. In refusing the request Judge Stadtmueller stated (R. 129):

> [T]here is virtually not one shred, and I underscore the word "shred" of evidence to suggest that any of these officers in any sense of the word coerced, pressured, cajoled this defendant into committing any criminal act, including the offense with which he is charged.

Mahkimetas maintains that Parduhn induced Mahkimetas to sell cocaine by using his mother, Patty, whom Parduhn believed to be intoxicated, to "set up her own son." At the jury instruction conference, counsel for Mahkimetas argued that "but for the mother, the son wouldn't have done this for

---

**2.** Mahkimetas' story as to where he went to get the cocaine differed from that told by the surveillance officer who testified to having followed Mahkimetas. According to the surveillance officer, Mahkimetas drove straight from the house where he met Parduhn to the Boutique. Mahkimetas entered the Boutique, came out a few minutes later and drove back to the house. Mahkimetas testified that he drove to a housing project on the reservation and gave the money to a person named "Todd," who brought back two packages that Mahkimetas then delivered to Parduhn.

the undercover officer" (R. 128). Mahkimetas further contends that there was no evidence that he had the predisposition to sell drugs. He points out that he received only $10 for the one delivery to Parduhn, and that on later occasions he never obtained cocaine for Parduhn.

■ In our circuit a defendant is entitled to an instruction on a particular theory of defense if he or she satisfies a four-part test (*United States v. Marren*, 890 F.2d 924, 929 (7th Cir.1989)):

1. Defendant proposes a correct statement of the law.

2. Defendant's theory of defense is supported by the evidence.

3. Defendant's theory is not part of the charge.

4. Noninclusion of a jury instruction as to defendant's theory of defense would deny defendant a fair trial.

Mahkimetas fails at step two, for his proposed entrapment instruction was unsupported by the evidence.

■ In that respect, any defendant who requests an entrapment instruction must produce sufficient evidence for a reasonable jury to find two things: government inducement of the crime and a lack of predisposition on defendant's part to engage in the criminal conduct (*Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 887, 99 L.Ed.2d 54 (1988); *Marren*, 890 F.2d at 929). In reviewing the denial of an entrapment instruction, we look at the record de novo to determine the sufficiency of the evidence in each respect (*Marren*, 890 F.2d at 930).

Predisposition, "the principal element in the defense of entrapment," distinguishes between the "unwary innocent" and "an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime" (*Mathews*, 485 U.S. at 63, 108 S.Ct. at 887). We have held several factors to be relevant in making that distinction (*United States v. Casanova*, 970 F.2d 371, 375–76 (7th Cir.1992)):

1. defendant's character or reputation;

2. whether the suggestion of criminal activity was originally made by the government;

3. whether defendant was engaged in criminal activity for a profit;

4. whether defendant evidenced a reluctance to commit the offense, overcome only by government persuasion; and

5. what type of inducement or persuasion was offered by the government.

Among those factors, our cases have said the fourth is most important: "Such reluctance is a good indicator that the government's actions motivated the defendant to commit the offense, thereby removing culpability from the defendant" (*United States v. Jones*, 950 F.2d 1309, 1314 (7th Cir.1991)).

■ Before we turn to that factor, we pause to examine the first three. At oral argument before us, Mahkimetas' counsel contended that the trial judge used the testimony that Mahkimetas claimed was erroneously admitted—Patty's statements to Parduhn before Parduhn talked to Mahkimetas—to justify the refusal of the entrapment instruction. But even apart from our earlier ruling rejecting the bulk of Mahkimetas' hearsay objection, analysis shows that the challenged evidence was not at all necessary as a basis for refusal of the instruction:

1. Parduhn testified that after the deal was completed, Mahkimetas gave Parduhn his address and phone number and told Parduhn to call him for further deals. Although Mahkimetas never again delivered drugs to Parduhn, Mahkimetas admitted to taking front money from Parduhn on several later occasions. On one of those Mahkimetas admitted to taking $100 up front. It was that date as to which a surveillance officer testified that he saw Mahkimetas drive to the same location at which the same officer had observed Mahkimetas on the day he delivered cocaine to Parduhn. Mahkimetas could not identify the date on which he took the $100, but Parduhn testified that it was April 29, three days after Mahkimetas made the initial delivery. Officer Giese, the surveillance officer,

testified that he watched Mahkimetas drive to the Boutique again on that day.

2. It does not matter for present purposes whether the first mention of drugs in the Parduhn–Patty conversations came from one or the other. What is relevant is that as to Mahkimetas it was obviously not Parduhn but Patty who made the initial suggestion that Mahkimetas get drugs for Parduhn—for she spoke with him on the phone before she put Parduhn on the line.

3. Parduhn testified that after Mahkimetas gave him the cocaine, Mahkimetas asked whether they could "do a couple of lines together or he wanted to know what he would get out of it for doing this for me" (R. 53–54). Parduhn gave Mahkimetas $10, an amount that Mahkimetas says is so small as to show he was not engaged in the activity for profit. Even so, Mahkimetas' own statement confirms that he was seeking *some* personal benefit.

Thus all of the first three considerations plainly point away from any notion of entrapment.

Now to the two remaining factors, which are so interrelated that they may be examined together (*Casanova*, 970 F.2d at 376):

4. Mahkimetas testified that when Parduhn asked him if he could meet him to get some cocaine (R. 111):

> I said, I don't know if I'll be able to get you some drugs. He goes, well, here goes your mother back. My ma got back on the phone. She said, we'll take a ride up there and see if you can get something from your friends or something. And I said, yeah, okay.

On his own version, then, Mahkimetas' initial expression of reluctance was followed by his ready agreement to the transaction only moments later when his mother got on the phone. Whenever a criminal defendant so promptly avails himself of a criminal opportunity, it is unlikely that an entrapment defense will warrant a jury instruction (*Jacobson v.*

*United States*, —— U.S. ——, ——, 112 S.Ct. 1535, 1541, 118 L.Ed.2d 174 (1992); accord on the issue of predisposition as "the key inquiry," *United States v. Evans*, 924 F.2d 714, 717 (7th Cir.1991)).

5. To show improper inducement, a defendant must "put forth evidence showing that he would not have committed the crime had the particular attraction or lure that the government held out not existed" (*Casanova*, 970 F.2d at 377, quoting *Marren*, 890 F.2d at 931). We have held that where sufficient evidence of predisposition exists, it is unnecessary to determine whether improper government inducement was present (*id.*). But in any event, the record here compels the conclusion that "the inducement here—if any—was so minimal as not to tempt the defendant to commit a crime that he otherwise would not have committed" (*United States v. Hawkins*, 823 F.2d 1020, 1025 (7th Cir.1987)).

In sum, those final factors also negate the existence of entrapment. When he first spoke to Mahkimetas about the transaction, Parduhn offered nothing—in fact, Mahkimetas had to ask after he made the delivery what he would get out of it. To counter the obvious implication of his unforced complaisance, Mahkimetas contends that Parduhn used his mother to "set him up" and that he would not have distributed the cocaine if she had not asked him to. But in advancing that argument Mahkimetas essentially throws away his defense, for "there is no defense of private entrapment" (*Jones*, 950 F.2d at 1315). As we said in *United States v. Manzella*, 791 F.2d 1263, 1269 (7th Cir.1986):

> Private entrapment is just another term for criminal solicitation, and outside the narrow haven created by the defense of necessity or compulsion, the person who yields to the solicitation and commits the solicited crime is guilty of that crime.[3]

If Mahkimetas was indeed responding to the inducement of his mother rather than

---

**3.** Here the chain of "inducement" is similar to that in *Manzella*. There the government agent induced a third party, Rizzo, to sell cocaine. Rizzo then induced Manzella to assist him.

Manzella, like Mahkimetas, testified that he was "acting to help out" the third party (*Manzella*, 791 F.2d at 1269). And in *Manzella*, as here, no basis was found for an entrapment instruction.

of the agent, there was no basis for an entrapment instruction.

### Conclusion

Mahkimetas has failed on both of his objections to his drug conviction. Accordingly his conviction is AFFIRMED.