In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 23-3094

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES T. WEISS,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:19-cr-00805-2 — **Steven C. Seeger**, *Judge.*

———————————

ARGUED JANUARY 15, 2025 — DECIDED AUGUST 28, 2025

———————————

Before ROVNER, JACKSON-AKIWUMI, and MALDONADO,
*Circuit Judges.*

ROVNER, *Circuit Judge.* Sweepstakes machines are a form
of gambling machine. In 2018, sweepstakes machines oper-
ated in a legal gray area; they were neither clearly legal nor
clearly illegal under existing Illinois law. James Weiss's com-
pany manufactured sweepstakes machines and, as a result,
Weiss had an interest in ensuring that sweepstakes machines
were clearly legal under Illinois law. To accomplish this goal,

Weiss attempted to bribe two state legislators, Luis Arroyo and Terrance Link, to pass legislation favorable to sweepstakes machines. Unbeknownst to Weiss, however, Link was cooperating with federal agents, ultimately leading to Weiss's conviction for wire fraud, mail fraud, and bribery after a jury trial.

On appeal, Weiss challenges statements the district court admitted at trial, one of the jury instructions given at trial, and his sentence. Because we find no error by the district court, we affirm.

I

Beginning in fall 2018, Weiss's company, Collage LLC, began making monthly payments to Arroyo's registered lobbying firm, Spartacus 3, LLC. In exchange, Arroyo became an extremely vocal supporter of sweepstakes legislation. He spoke in support of such legislation at gaming committee hearings, advocated for it during meetings with the Illinois General Assembly's leadership, and approached other legislators to encourage them to pass sweepstakes legislation. In fact, Arroyo approached State Representative Robert Rita about sweepstakes legislation so frequently that State Representative Rita began avoiding Arroyo. These efforts failed, however, and gaming legislation was passed in June 2019 without any sweepstakes-related provisions.

Undeterred, Weiss and Arroyo sought to have the gaming legislation amended through a "trailer bill," which can modify already-passed legislation. Doing so would require the support of State Senator Link, one of the sponsors of the gaming bill.

On August 2, 2019, Arroyo and Weiss met with Link to ask him to support sweepstakes legislation during the "veto session"—which occurs in the fall—perhaps through the passage of a trailer bill. At the end of the meeting, Link asked to speak with Arroyo alone and asked Arroyo "what's in it for me?" Arroyo explained that Link could be paid the "[s]ame way" he was "getting paid." Arroyo also explained that the money could be sent to another individual, presumably to hide its intended recipient. After this meeting, Arroyo stayed in contact with Link, and a second meeting was arranged for August 22, 2019.

In advance of the second meeting, the FBI directed Link to ask that any payments be made to "Katherine Hunter," a fictious individual. Weiss drove Arroyo to the second meeting, but he remained in the car during the meeting. During the second meeting, Arroyo presented Link with a check from Collage LLC—Weiss's company—with a blank payee line. As Arroyo took out the check, he said, "this is the jackpot" and asked for whom the check should be made out. At Link's instruction, Arroyo wrote "Katherine Hunter" on the payee line. Arroyo also presented Link with a draft of the legislation and Weiss's business card. After the meeting, Weiss emailed the draft legislation to Link, and later, Weiss sent Link another check with "Katherine Hunter" named as the payee to an address that Link provided to Arroyo.

By October 2019, FBI agents had obtained a search warrant for Weiss's person and cell phone. After watching Weiss drive away from his home, the agents pulled Weiss over by activating the lights on their vehicle.

The agents then approached Weiss's vehicle and said that they needed to speak with him, to which Weiss asked if he

should get out of his car. The agent responded by asking Weiss if he would join them in the FBI vehicle and told him that he was not under arrest.

During the conversation, Weiss stated that he wanted to cooperate with the agents, but he made verifiably false statements to the agents. For example, he stated that he spoke with Katherine Hunter on the phone, and that he knew the check would ultimately go to Katherine Hunter before the August 22 meeting. This, of course, is not possible, as Link had not yet given Arroyo or Weiss Katherine Hunter's name, and they could not have learned of it independently because she was fictitious.

All told, the agents asked Weiss questions for approximately 1 hour and 40 minutes. At the end of the interview, the agents executed the warrant for Weiss's phone.

Before trial, Weiss moved to suppress the statements he made to the FBI agents, claiming that he should have been given *Miranda* warnings before the conversation. The district court denied Weiss's motion, as well as his motion for reconsideration. Also before trial, the government moved to admit Arroyo's recorded statements as coconspirator statements under Federal Rule of Evidence 801(d)(2)(E). The district court granted the government's motion.

At trial, the jury heard evidence about the alleged scheme. For example, the jury heard that Weiss's company paid Arroyo's company from November 1, 2018 until October 1, 2019. The jury also heard that, during the same time, Arroyo became a very vocal and unrelenting advocate for sweepstakes legislation. Link testified about the August 2 and August 22 meetings, and federal agents testified about the materials sent

by Weiss to Link and the conversation they had with Weiss before the execution of the search warrant.

During the trial, the court held multiple jury instruction conferences. During the conferences, Weiss's counsel objected to certain jury instructions.

After about six days of trial and approximately four hours of deliberation, the jury found Weiss guilty on all charges. Weiss requested that his sentencing be delayed until after the enactment of certain changes to the Sentencing Guidelines, but the district court refused, explaining that it would apply its ordinary schedule, with a slight delay to accommodate defense counsel's schedule.

At sentencing, the district court explained that it had to "apply the guidelines as they exist today, today, the day of sentencing." Sentencing Tr. 90:21–22. The district court continued that it was "not supposed to apply future guidelines that may or may not go into effect" but it could "consider them" and it would "consider them for the Section 3553 [factors]." *Id.* at 90:23–25. Later, the district court reiterated that it was imposing the guidelines as they were written at the time of sentencing, but that it would consider the upcoming changes when evaluating the § 3553(a) factors.

The district court calculated the guidelines range to be 51 to 63 months, based on Weiss's offense level and criminal history category. Weiss sought leniency, but the government sought a sentence at the high end of the guidelines range, arguing that Weiss had shown no remorse.

The district court asked both parties to explain Weiss's culpability compared to that of Arroyo. The government argued that they were similarly culpable, but Weiss argued that only

a subset of the payments were bribes, and that Arroyo was more culpable as the public official.

Before imposing the sentence, the district court discussed each of the § 3553(a) factors. In doing so, it remarked that it was concerned that Weiss did not internalize that he had committed a crime, and that it was concerned that Weiss may commit the same crime again. The district court also noted that although Arroyo pled guilty to one crime, the jury found Weiss guilty of seven crimes. Finally, the district court reiterated that it was considering the upcoming changes to the guidelines. Ultimately, the court imposed a sentence of 66 months, which was three months above the high end of the guidelines range.

Weiss now appeals, arguing that the district court erred in admitting the statements he made to the FBI agents and Arroyo's statements to Link, using a jury instruction that defined "official act," refusing to delay his sentencing, and in imposing a sentence of 66 months. We affirm the decisions of the district court.

II

We begin with Weiss's challenge to the admission of his statements to FBI agents. Weiss argues that his statements should be suppressed because the agents did not give him *Miranda* warnings. Whether *Miranda* warnings were required depends on whether Weiss was "in custody" when he spoke with the agents. *Miranda v. Arizona*, 384 U.S. 436, 477–78 (1966). "*Miranda* warnings are not required merely because the individual questioned by law enforcement officers is a suspect or is the focus of a criminal investigation. The suspect must be both 'in custody' and subjected to 'interrogation'

before the *Miranda* warning[s] are required to be administered." *United States v. Budd*, 549 F.3d 1140, 1145 (7th Cir. 2008) (alteration in original) (quoting *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006)). The proper inquiry for whether an individual is "in custody" is "whether a reasonable person in the defendant's position would believe that he or she was free to leave." *United States v. Lennick*, 917 F.2d 974, 977 (7th Cir. 1990). The individual's subjective belief is not relevant. *Id.*

Custody is the touchstone for *Miranda* purposes, and the mere presence or execution of a search warrant is not dispositive of the custody inquiry. *See United States v. Madoch*, 149 F.3d 596, 600–01 (7th Cir. 1998) (analyzing whether defendant was "in custody" during the execution of a search warrant for *Miranda* purposes). Indeed, even if agents anticipated executing the search warrant, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 441–42 (1984). Even the *Mittel-Carey* case, upon which Weiss relied heavily in briefing and oral argument, turned on whether the defendant was "in custody." *United States v. Mittel-Carey*, 456 F. Supp. 2d 296, 308–09 (D. Mass. 2006), *aff'd,* 493 F.3d 36 (1st Cir. 2007). Thus, we must analyze whether a reasonable individual in Weiss's position would have felt free to terminate the interrogation and leave. *Howes v. Fields*, 565 U.S. 499, 509 (2012) (citation modified).

Whether an individual was "in custody" for the purposes of *Miranda* is a mixed question of law and fact, qualifying for independent appellate review. *United States v. Borostowski*, 775 F.3d 851, 859 (7th Cir. 2014). "Relevant factors include the

location of the questioning, its duration, statements made during the interrogation, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of questioning." *Id.*

After considering the relevant circumstances, we conclude that Weiss was not in custody when he spoke with the agents. Weiss points to several factors, including that the agents pulled him over, said they "needed" to speak with him, asked him to join them in their police vehicle, did not limit their questions in scope or duration, locked the car doors during the conversation (an allegation that the district court rejected), and intended to execute the search warrant after the conversation concluded. But viewed in the broader context, a reasonable person in Weiss's position would feel free to leave. The FBI agents stopped Weiss on a public street. Importantly, after pulling him over, the agents told Weiss that he was not under arrest and that the conversation was voluntary. The agents did not order Weiss out of his car, nor did they use handcuffs or other physical restraints to detain him. At one point, Weiss even left the police vehicle for his cell phone and then returned to the police vehicle. Even though the duration of the interview was approximately one hour and forty minutes, the length is largely attributable to Weiss's cooperation with the agents. And the agents' uncommunicated intent to execute the search warrant at the end of the conversation does not affect how a reasonable person in Weiss's position would have felt. *Berkemer*, 468 U.S. at 441–42. In all, a reasonable person in Weiss's circumstances would have felt free to terminate the conversation and leave. *Howes*, 565 U.S. at 509; *see Budd*, 549 F.3d at 1146 (voluntary conversation at police station not custodial for *Miranda* purposes).

Despite Weiss's insistence to the contrary, our conclusion does not carve out an exception to *Miranda* when officers execute search warrants. The custody and interrogation determinations remain the touchstone for *Miranda*, as the cases cited by the defendant recognize. *United States v. Burns*, 37 F.3d 276, 281 (7th Cir. 1994) ("Burns was thus not in custody for purposes of *Miranda*."); *United States v. Kim*, 292 F.3d 969, 978 (9th Cir. 2002) ("We therefore hold that Kim was 'in custody' when the police interrogated her without providing her with *Miranda* warnings, and AFFIRM the district court's order granting the motion to suppress Kim's statements to the police."); *Mittel-Carey*, 493 F.3d at 39–40 ("[W]e conclude that the district court was correct that Mittel–Carey was in custody at the time of his interrogation and therefore should have received *Miranda* warnings."). If the circumstances surrounding the execution of the warrant would make a reasonable person feel that he or she could not leave, then *Miranda* warnings are required. We do not doubt that circumstances exist under which a reasonable individual who is the subject of a search warrant would not feel free to leave. But under the circumstances before us here, we come to the opposite conclusion.

Weiss also challenges the stop on Fourth Amendment grounds, arguing that the stop was unreasonable because it was unduly prolonged. Before we proceed with our analysis, we must first clarify the issue before us. In his brief, Weiss argued exactly once that the "unduly prolonged detention" warranted suppression of the contents of his cellphone in addition to the statements he made to the agents. Weiss Op. Br. at 22. Aside from that singular mention of his cellphone, Weiss made no additional argument that the contents of his phone should be suppressed. Confused by the undeveloped request to suppress the contents of Weiss's cellphone made

only in passing, the court asked at oral argument, "are you arguing that the contents of Mr. Weiss's phone should be suppressed?" Oral Argument at 44:59–45:05. Weiss's counsel responded, "[w]e are arguing that anything—no—we—the contents of the phone is not really our dispute, it's the actual statements. The contents of the phone really had no evidence on it that was used at the trial, so it's not really that important to us. It's the actual statements because those statements were key[.]" *Id.* at 45:06–45:20. Weiss, therefore, has waived any argument that the contents of his cellphone should be suppressed. *See Anchor Glass Container Corp. v. Buschmeier*, 426 F.3d 872, 877 (7th Cir. 2005). ("We routinely permit parties to voluntarily abandon previously briefed issues at oral argument as a means of focusing the issues on appeal."). And, in any event, the length of the stop is directly attributable to Weiss's continuing the conversation, not unconstitutional behavior by the agents. "A consensual encounter between an individual and a law enforcement official does not trigger Fourth Amendment scrutiny." *United States v. Figueroa-Espana*, 511 F.3d 696, 702 (7th Cir. 2007). Under these circumstances, we cannot find that agents unduly prolonged Weiss's seizure.

## III

We next turn to the district court's admission of Arroyo's statements under Federal Rule of Evidence 801(d)(2)(e), which allows the admission of out-of-court statements offered against a defendant that were made by the defendant's coconspirator during and in furtherance of a conspiracy. *See* Fed. R. Evid. 801(d)(2). Weiss argues that the district court improperly admitted Arroyo's statements to Link because no conspiracy existed between Arroyo and Link, nor did any

conspiracy exist between Arroyo and Weiss. The district court preliminarily admitted Arroyo's statements following the government's *Santiago* proffer. *See United States v. Davis*, 845 F.3d 282, 286 (7th Cir. 2016) (describing the *Santiago* proffer process). After the jury rendered its verdict, Weiss moved for a new trial on the basis that the government failed to prove that a conspiracy existed. The district court overruled Weiss's motion, finding that "Weiss and Arroyo […] worked together to attempt to purchase the support of Senator Link through corrupt means." R. 365 at 1–2.

We review the district court's decision to admit evidence for abuse of discretion. *United States v. Medrano*, 83 F.4th 1073, 1076 (7th Cir. 2023). This review is done with "great deference" to the district court. *Doornbos v. City of Chicago*, 868 F.3d 572, 579 (7th Cir. 2017). "We will reverse only if no reasonable person would agree with the trial court's ruling and the error likely affected the outcome of the trial." *Perry v. City of Chicago*, 733 F.3d 248, 252 (7th Cir. 2013). We review for clear error the district court's findings as to whether a conspiracy existed, whether the defendant and the declarant were members of that conspiracy, and whether the statement was made in furtherance of the conspiracy. *United States v. Mahkimetas*, 991 F.2d 379, 382 (7th Cir. 1993). Courts may consider the statement at issue when determining whether it is a coconspirator statement, but the statement may not be the sole basis for admission. *Medrano*, 83 F.4th at 1076. Given the inherently secretive nature of conspiracies, which do not lend themselves to the creation of direct evidence of their existence, circumstantial evidence is sufficient. *See Davis*, 845 F.3d at 288–89.

At the outset, we set aside Weiss's arguments that Link could not have been a member of the conspiracy because he

was a government informant. The trial court did not admit Arroyo's statements on the basis that Weiss and Link were coconspirators. Instead, our focus is whether the district court erred in determining that Arroyo's statements to Link were made in furtherance of a conspiracy between Weiss and Arroyo. Link's status as a government informant does not control the outcome of this inquiry. "It is universally held that the fact that one party to a conversation is a government agent or informer does not itself preclude the admission of statements by the other party—if he or she is a member of a conspiracy—under Rule 801(d)(2)(E)[.]" *Mahkimetas*, 991 F.2d at 383.

A conspiracy exists when there is "an agreement to commit some illegal act" and "the alleged coconspirator knew 'something of its general scope and objective though not necessarily its details.'" *Id.* at 382 (quoting *United States v. Cerro*, 775 F.2d 908, 911 (7th Cir. 1985)). Weiss asserts that "no independent conspiracy to bribe Link existed between Arroyo and Weiss," Weiss Op. Br. at 31, but the government presented ample evidence to the contrary. After Weiss began paying Arroyo, Arroyo became extremely vocal about passing sweepstakes legislation. So vocal, in fact, that at least one other state legislator began avoiding Arroyo because of his persistence. Then, after the gaming bill was passed without sweepstakes provisions, Weiss and Arroyo approached one of the gaming legislation's sponsors, Link. As the sponsor of the gaming bill, Link's support was necessary to pass a trailer bill that would modify the gaming bill to include sweepstakes provisions. Even though Weiss was not present when Arroyo assured Link that he would be paid for his efforts, Arroyo's assurance still furthered the aims of the conspiracy between Weiss and Arroyo. And during a conversation approximately three weeks later, Arroyo gave Link a copy of the desired

legislation, Weiss's business card, and a check with a blank payee line from Weiss's company.

The evidence also demonstrated the free passage of information and coordination between Arroyo and Weiss regarding Link's involvement. At the August 2 meeting, Arroyo told Link that he was being paid $2,500 per month, and "we'll talk to each other to make sure that you're rewarded for what you do […] for what we gonna do moving forward. Same way I'm getting paid—I'm getting paid […] $2,500 dollars a month." R. 323-1. Weiss then drove Arroyo to the August 22 meeting in which Arroyo gave Link Weiss's business card, a copy of the desired legislation, and a check to be paid from Weiss's company with a blank payee line. At Link's direction, Arroyo filled out the payee line, even though the check was from Weiss's company. Later, Link asked Weiss whether Weiss had sent him another check. In response, Weiss shared a photograph of a note with an address on it and said, "this is where [Arroyo] told me to send it." Trial Tr. 611:7–612:9. And shortly after Arroyo met with Link on August 22 and assured Link that Weiss would send Link a copy of the draft legislation, Weiss emailed Link a copy of the legislation. Further, during conversations with the FBI, Weiss demonstrated knowledge of information that could have only been obtained through the Link-Arroyo chain. Namely, that he was paying "Katherine Hunter" a fictitious individual who had been fabricated by the FBI.

Under these circumstances, we cannot say that the district court clearly erred when it concluded that Weiss and Arroyo "worked together to attempt to purchase the support of Senator Link through corrupt means," R. 365 at 1–2, nor did it abuse its discretion in admitting the statements and denying

Weiss's motion for a new trial. The evidence presented demonstrated that Weiss and Arroyo were aligned on the conspiracy's scope and objective. Although Weiss was not present when Arroyo told Link that he could be paid the "same way" and that once Link gets the "legislation […] we'll talk to each other to make sure that you're rewarded for what you do for […] what we gonna do moving forward," R. 323-1, Weiss's physical absence does not preclude the admission of these statements because they furthered Arroyo and Weiss's conspiracy. "This court has repeatedly held that a statement attempting to recruit new members to the conspiracy is 'in furtherance' of the conspiracy." *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010) (citing cases); *see Mahkimetas*, 991 F.2d at 384 (no error in admitting statements from one conspirator in the absence of the other conspirator when a conspiracy is demonstrated by a preponderance of the evidence). In sum, the district court's conspiracy finding was not clearly erroneous, and it did not abuse its discretion in admitting the statements.

IV

Next, we turn to Weiss's challenge to the jury instructions. Our review here is for plain error because Weiss raises objections that are substantively different from those he raised before the district court. *United States v. DiSantis*, 565 F.3d 354, 362 (7th Cir. 2009); *United States v. Thomas*, 933 F.3d 685, 690, 695 (7th Cir. 2019). Even though Weiss states that he challenged the relevant portion of the instruction in R. 302, we have failed to find anything resembling the arguments that Weiss makes here—namely that the challenged instruction is overbroad and directs the verdict on an element of the crime—within that docket entry. Perhaps recognizing the

difference between the arguments that he raised before the district court and those he raises on appeal, Weiss concedes that plain error applies. Weiss Reply Br. at 15.

To show plain error, Weiss must demonstrate "that there was an actual error, that the error was plain, that the error affected [his] substantial rights, and that the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Javell*, 695 F.3d 707, 713 (7th Cir. 2012) (alteration in original) (citation modified). To be a plain error, the error must be "obvious, crucial, and egregious." *Id.* (citation modified). "To show that an error affected a defendant's substantial rights, he must demonstrate that [the error] affected the outcome of the district court proceedings." *United States v. Lawson*, 810 F.3d 1032, 1040 (7th Cir. 2016) (alteration in original) (citation modified).

Weiss argues that the district court should not have instructed the jury that "promoting the enactment of legislation related to the sweepstakes industry by the Illinois General Assembly is an official act" because it improperly directed the verdict on a factual element of the crime. Weiss argues that it should have been for the jury to determine not just whether Weiss induced a public official to perform an official act in exchange for something of value, but also to determine whether the requested action constituted an official act at all.

In *McDonnell*, the Supreme Court clarified the contours of the term "official act" in the federal bribery statute. *McDonnell v. United States*, 579 U.S. 550 (2016). In doing so, the Supreme Court did not refrain from opining on what actions would constitute an "official act" in McDonnell's case. *Id.* at 572 ("For example, a decision or action to initiate a research study—or a decision or action on a qualifying step, such as narrowing

down the list of potential research topics—would qualify as an 'official act.' […] In addition, if a public official uses his official position to provide advice to another official, knowing or intending that such advice will form the basis for an 'official act' by another official, that too can qualify[.]"). It seems that if the Supreme Court wished for "official acts" to be a question for the jury alone, then it would not have provided examples of specific acts that could constitute official action in McDonnell's case before remanding it. Separately, we note that some other circuits have not refrained from opining that some actions are clearly "official acts" after *McDonnell*. *See United States v. Burnette*, 65 F.4th 591, 598 (11th Cir. 2023) ("[N]o one disputes (or could) that casting or abstaining from a vote on a covered matter, or agreeing to do either, would constitute the sort of act that triggers [the federal bribery statute's] prohibition."); *United States v. Roberson*, 998 F.3d 1237, 1251 n.19, 1251–52 (11th Cir. 2021) (stating "Representative Robinson's […] vote on SJR-97 is undeniably an official act" and opining that jury could properly conclude that attendance at meetings where Representative "intend[ed] and attempt[ed] to use his position as legislator to influence […] decisions" also constituted official act); *United States v. Boyland*, 862 F.3d 279, 291–92 (2d Cir. 2017) (no plain error despite jury instruction being erroneous after *McDonnell* when official acts included administrative decisions necessary to secure grant money, award demolition contracts, and enact zoning changes).

With this context in mind, we turn to *Lindberg*, a Fourth Circuit case upon which Weiss relies heavily. In *Lindberg*, the alleged "official act" was "the reassignment of a Senior Deputy Commissioner assigned to review Lindberg's insurance companies." *United States v. Lindberg*, 39 F.4th 151, 156 (4th

Cir. 2022). In instructing the jury, the district court there stated, "the removal or replacement of a [S]enior [D]eputy [C]ommissioner by the [C]ommissioner would constitute an official act." *Id.* at 157 (alterations in original). On appeal, the Fourth Circuit found that "it was the role of the jury to determine whether conduct constitutes an official act" and, thus, the district court erred by defining "official act" in the jury instructions. *Id.* at 161.

At first glance, this instruction may look quite similar to the instruction given here. But further examination yields differences that are of note. For example, the instructions differ in their granularity. The official act at issue in *Lindberg* was the removal and replacement of the Senior Deputy Commissioner. There is often little room for debate or argument about whether an individual was, in fact, formally dismissed from their job and replaced by another person. By contrast, "promotion" is comparatively more capacious, allowing the jury more latitude in determining 1) whether Weiss induced a public official to promote the passage of sweepstakes legislation in exchange for something of value and 2) whether that "promotion" was no more than "set[ting] up a meeting, host[ing] an event, or call[ing] or talk[ing] to another public official"—all acts the jury instructions made clear were not official acts. R. 320-1, at 24–25. And separately, the promotion of passing legislation—particularly when done to other legislators—is more akin to those tasks that are at the epicenter of an official's duties than hiring and firing.

But even setting these differences aside, there is an even more fundamental difference that is fatal to Weiss's argument. At Lindberg's trial, the district court specifically forbade Lindberg from arguing that his action was not an official

act. *Lindberg*, 39 F.4th at 163, 163 n.10. No similar prohibition was made here, nor does Weiss explain how the allegedly erroneous instruction affected the jury considering the other instruction, and in light of the evidence presented at trial. Remember, under plain error review Weiss must articulate how this allegedly erroneous instruction affected the outcome of the trial. *Lawson*, 810 F.3d at 1040. And, as noted, the jury instructions as given gave Weiss plenty of room to argue that his actions did not constitute "promotion" and, even if they did constitute promotion, they did not constitute an "official act" as defined by the jury instructions.

During the trial, Link testified that he understood that he was being offered money "in exchange for pushing forward legislation" and that Weiss provided him with the desired legislation. Trial Tr. 614:21–615:2, 664:22–665:8. In closing arguments, the government stated "[Weiss] and Arroyo were pushing others to use their legislative powers to amend the law. That is an official act," *Id.* at 1427:25–1428:2, and "[t]hey were trying to change the law. And that is an official act," *Id.* at 1428:12–13, and "[w]hen Arroyo uses his official position to exert pressure on another official to perform an official act or to advise another official, that is official action. That's what he did here." *Id.* at 1555:19–23; *see McDonnell*, 579 U.S. at 572 (official act includes when "a public official uses his official position to provide advice to another official, knowing or intending that such advice will form the basis for an 'official act' by another official"). And shortly after the jury heard the instruction that "[p]romoting the enactment of legislation related to the sweepstakes industry by the Illinois General Assembly is an official act," the jury also heard that "[a] public official does not" perform an official act "if he does no more than set up a meeting, host an event, or call or talk to another

public official." R. 320-1, at 24–25. For his part, Weiss argued repeatedly in closing arguments that no official acts had occurred. Trial Tr. 1489:21–1490:5, 1507:7–10, 1508:15–19, 1512:1–2, 1519:5–11.

In his briefing, Weiss does not explain how this single line in the jury instructions, in context with the other jury instruction and against the backdrop of the entire trial, affected his "substantial rights." *Javell*, 695 F.3d at 713. Weiss does not account for the arguments he made during trial, namely in arguing that no official act occurred, nor does he explain how the inclusion of the challenged sentence changed the outcome of his trial, in light of the evidence presented and the arguments made. With all the necessary components in view, it is clear that the jury could have either acquitted Weiss on the basis that Weiss paid officials to do no more than "set up a meeting, host an event, or call or talk to another public official," R. 320-1 at 24–25, or they could have convicted him on the basis that he paid officials to try to amend the gaming law to include sweepstakes provisions. Weiss does not account for much of this broader context, nor does he account for the differences between the only case he cites, *Lindberg*, and the circumstances here.

It is not our responsibility to construct arguments for litigants. Failure to adequately explain one's argument is waiver, and we are left with many holes in Weiss's argument after reading his briefs. "Undeveloped and unsupported arguments may be deemed waived." *United States v. Thornton*, 642 F.3d 599, 606 (7th Cir. 2011).

But regardless of whether Weiss's argument is waived or not, it certainly does not demonstrate plain error. *United States v. Sloan*, 939 F.2d 499, 502 (7th Cir. 1991) ("To determine

whether a jury instruction was plain error, we must examine the entire trial record to see if the instruction had a probable impact on the jury's finding."). Against the backdrop we have elucidated above, and the actions claimed to be "official acts" at trial, we cannot conclude that the challenged sentence affected the outcome of the trial. *Lawson*, 810 F.3d at 1040.

Weiss's second argument, that the challenged instruction is overbroad, fails for similar reasons. The instruction immediately following the challenged instruction stated that an official does not perform an official act "if he does no more than set up a meeting, host an event, or call or talk to another public official," which matches the requirements outlined in *McDonnell*. R. 320-1 at 25; *see McDonnell*, 579 U.S. at 578. We must read the jury instructions comprehensively. *See United States v. Erramilli*, 788 F.3d 723, 730 (7th Cir. 2015). But even if we did find error, Weiss has again failed to articulate how any potential overbreadth affected the outcome of his trial, particularly given the "official acts" alleged at trial. Absent an effect on the outcome of the trial, Weiss cannot demonstrate plain error. *Lawson*, 810 F.3d at 1040.

V

Finally, we turn to Weiss's alleged sentencing errors. We review procedural errors in sentencing *de novo*, "assuming the objections on appeal are preserved." *United States v. Wilcher*, 91 F.4th 864, 869 (7th Cir. 2024). "If the district court erred, we apply the doctrine of harmless error to determine whether resentencing is necessary." *Id.* After we review the sentence for procedural errors, "we review the substantive reasonableness

of the sentence for abuse of discretion." *United States v. Campbell*, 37 F.4th 1345, 1349 (7th Cir. 2022).

Weiss argues that it is not clear what guidelines the district court used when calculating Weiss's sentence. This is a nonstarter. The district court was clear that it was applying the guidelines in effect at the time of sentencing, and that it would consider the mitigating effect of future guidelines in considering Weiss's § 3553(a) factors. It repeated this at least four times throughout the sentencing hearing. Weiss's argument that the district court may have enhanced his sentence because of the upcoming guidelines change is fanciful. While discussing the *mitigating factors* related to sentencing, the district court addressed the upcoming guidelines change. And, indeed, before the district court imposed its sentence, it explained that it had "taken into account fully the fact that the guidelines are likely to change in a direction that would be favorable to [Weiss]." Sentencing Tr. at 180:14–16. Weiss's arguments are unsupported by the sentencing transcript, and we find no error.

Weiss next argues that his sentence of 66 months was substantively unreasonable, especially in comparison to Arroyo who received a sentence of 57 months. We find no abuse of discretion. *Campbell*, 37 F.4th at 1349. The district court went to great lengths to explain the sentence it gave to Weiss, including why it departed upward from the guidelines range. Indeed, the district court opined on the need for specific deterrence, remarking that, at times, it seemed like Weiss was questioning whether an offense had occurred. The district court also addressed the need for general deterrence, and it expressed concern that "the status quo […] is not working." Sentencing Tr. 174:14. And even though Weiss is correct that

he was sentenced for a longer term of imprisonment than Arroyo, Arroyo accepted responsibility whereas Weiss did not. And, as the government argued and the district court acknowledged, Weiss stood to gain much more from the offenses than Arroyo. The district court considered Weiss's history and characteristics and the nature of Weiss's offenses. In all, the district court considered each of the § 3553(a) factors, as well as the arguments made by both parties when imposing its sentence, and it explained the reason for its above-guidelines sentence. We see no abuse of discretion. *See United States v. Hatch*, 909 F.3d 872, 874 (7th Cir. 2018) (per curiam) (affirming an explained above-guidelines sentence).

Finally, Weiss argues that the district court abused its discretion by refusing to delay sentencing until after upcoming guidelines changes went into effect. The district court did not abuse its discretion. *Campbell*, 37 F.4th at 1349. Delaying sentencing for possible changes in the guidelines is a slippery slope, and we cannot fault the district court for refusing the invitation to do so. Guidelines may or may not go into effect for several reasons, thus opening the possibility of delaying sentencing indefinitely. Moreover, it would be difficult for us to fashion any sort of rule that would determine how soon a Guidelines change should go into effect to warrant a delay. Finding an abuse of discretion on this ground would only create administrative headaches for district courts and run the risk of uneven application among defendants. And separately, the district court made clear that it considered the upcoming guidelines changes as a mitigating factor when evaluating the § 3553(a) factors. Under these circumstances, we find no abuse of discretion.

For the reasons above, we AFFIRM the holdings of the district court.